FRENCH LICK TOWNSHIP TRUS-TEE ASSESSOR (Orange County, In), Petitioner,

v.

KIMBALL INTERNATIONAL, INC., Respondent.

No. 49T10–0604–TA–44.

Tax Court of Indiana.

May 3, 2007.

---

Marilyn S. Meighen, Meighen & Associates, PC, Carmel, IN, Attorney for Petitioner.

Larry J. Stroble, Randal J. Kaltenmark, Ziaaddin Mollabashy, Barnes & Thornburg, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

The French Lick Township Trustee Assessor of Orange County, Indiana (Assessor) appeals the final determination of the Indiana Board of Tax Review (Indiana Board) valuing the real property of Kimball International, Inc. (Kimball) for the 2002 tax year. The issue for the Court to decide is whether the Indiana Board's determination was improper.

## FACTS AND PROCEDURAL HISTORY

Kimball owns a vacant industrial plant in French Lick Township, Orange County, Indiana. For the 2002 assessment, the Assessor valued Kimball's plant at $2,912,300 ($164,600 for the land and $2,747,700 for the improvements). Kimball filed an appeal with the Orange County Property Tax Assessment Board of Appeals (PTABOA), claiming that the assessment did not accurately reflect the property's market value-in-use. After a hearing, the PTABOA reduced Kimball's assessed value to $2,595,200 ($164,600 for the land and $2,430,600 for the improvements).

Kimball subsequently filed a Petition to the Indiana Board of Tax Review For Review of Assessment (Form 131). The Indiana Board held a hearing on Kimball's Form 131 on August 30, 2005. On March 14, 2006, the Indiana Board issued a final determination in which it reduced Kimball's assessment to $1,685,000.

On April 27, 2006, the Assessor initiated an original tax appeal, claiming that the Indiana Board's final determination was not supported by the evidence. The Court heard the parties' oral arguments on February 2, 2007. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

This Court gives great deference to final determinations of the Indiana Board when it acts within the scope of its authority. *Wittenberg Lutheran Vill. Endowment Corp. v. Lake County Prop. Tax Assessment Bd. of Appeals,* 782 N.E.2d 483, 486 (Ind. Tax Ct.2003), *review denied.* Consequently, the Court will reverse a final determination of the Indiana Board only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE ANN. § 33–26–6–6(e)(1)–(5) (West 2007). The party seeking to overturn the Indiana Board's final determination bears the burden of proving its invalidity. *Osolo Twp. Assessor v. Elkhart Maple Lane Assocs.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003).

## DISCUSSION AND ANALYSIS

Under Indiana's assessment system, real property is assessed on the basis of its "true tax value." IND.CODE ANN. § 6–1.1–31–6 (West 2002). "True tax value" does not mean fair market value, but rather "[t]he market value-in-use of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property[.]" 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (hereinafter, Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3–1–

2 (2002 Supp.)) at 2. *See also* A.I.C. § 6–1.1–31–6(c). In turn, a property's market value-in-use "may be thought of as the ask price of property by its owner, because this value ... represents the utility obtained from the property, and the ask price represents how much utility must be replaced to induce the owner to abandon the property." [1] Manual at 2 (footnote added).

■ In order to determine market value-in-use,[2] Indiana has promulgated a series of guidelines that explain the valuation process for both land and improvements. *See* REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002—VERSION A (2004 Reprint) (hereinafter, Guidelines) (incorporated by reference at 50 I.A.C. 2.3–1–2(c)), Books 1 and 2 (footnote added). Because assessors often operate under the constraints of limited time and resources, Indiana employs a mass appraisal system; therefore, the Guidelines provide a starting point for an assessor to determine a property's market value-in-use.[3] *See* Manual at 3; Guide-

1. "In markets in which sales are not representative of utilities, either because the utility derived is higher than indicated sale prices, or in markets where owners are motivated by non-market factors such as the maintenance of a farming lifestyle even in the face of a higher use value for some other purpose, true tax value will not equal value in exchange. In markets where there are regular exchanges, so that ask and offer prices converge, true tax value will equal value in exchange[.]" 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (hereinafter, Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3–1–2 (2002 Supp.)) at 2.

2. The Manual recognizes three generally accepted appraisal techniques, which may be used to calculate a property's market value-in-use. *See* Manual at 3. More specifically: The first approach, known as the *cost approach*, estimates the value of the land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value. The second approach, known as the *sales comparison approach*,

estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market. The third approach, known as the *income approach*, is used for income producing properties that are typically rented. It converts an estimate of income, or rent, the property is expected to produce into value through a mathematical process known as capitalization. *Id.*

3. In other words, Indiana recognizes that because "assessing officials are faced with the responsibility of valuing all properties within their jurisdictions during a reassessment[, they] often times do not have the data or time to apply all three approaches to each property." Manual at 3. As a result, the primary method for Indiana assessing officials to determine a property's market value-in-use is the cost approach. *Id.*

lines, Book 1 at 1 (footnote added). To the extent that an assessor may err in applying the Guidelines, however, the assessment will not necessarily be invalidated so long as the assessment accurately reflects the property's market value-in-use. *See* 50 IND. ADMIN. CODE 2.3–1–1(d) (2002 Supp.).

■ While a property's market value-in-use (i.e., true tax value), as ascertained through an application of the Guidelines, is presumed to be accurate, that presumption is rebuttable. *See* Manual at 6. Thus, a taxpayer

> shall be permitted to offer evidence relevant to the *fair market value-in-use* of the property to rebut such presumption and to establish the actual true tax value of the property so long as such information is consistent with the definition of true tax value provided in this [M]anual and was readily available to the assessor at the time the assessment was made. *Such evidence may include actual construction costs, sales information regarding the subject or comparable properties, appraisals that are relevant to the market value-in-use of the property, and any other information compiled in accordance with generally accepted appraisal principles.*

*Id.* (emphases added). Accordingly, when a taxpayer chooses to challenge an assessment, he must show that the assessor's assessed value does not accurately reflect the property's market value-in-use.[4]

At the administrative hearing, Kimball presented a "Summary Report of a Retrospective Complete Appraisal" (appraisal) and letters from its realty company to show that its property's actual market value-in-use was $1,685,000.[5] *(See* Cert. Admin. R. at 115–20, 224–76 (footnote added).) The appraisal, which was prepared by Mr. Donald Feicht, Jr., an appraiser licensed in Ohio and Florida, employed the cost approach, the income approach, and the sales comparison approach to estimate the value of the property.

Under the cost approach, Mr. Feicht estimated that the total value of the subject property was $1,800,000 as of January 1, 1999. *(See* Cert. Admin. R. at 250–51 (stating that Mr. Feicht modified Marshall & Swift construction costs to reflect costs as of January 1, 1999 and to be specific to Orange County, Indiana).) *See also* Manual at 4 (explaining that a 2002 general assessment is to reflect a property's market value-in-use as of January 1, 1999). Under the income approach, Mr. Feicht estimated the value of the property was $1,700,000.[6] *(See* Cert. Admin. R. at 262–

---

**4.** This Court has previously stated that "the most effective method to rebut the presumption that an assessment is correct is through the presentation of a market value-in-use appraisal, completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP)." *Kooshtard Prop. VI, LLC v. White River Twp. Assessor,* 836 N.E.2d 501, 506 n. 6 (Ind. Tax Ct.2005), *review denied.*

**5.** Kimball also submitted a multiple regression analysis, which indicated that the value of the property as of January 1, 1999 was $1,860,000. (Cert. Admin. R. at 121–223, 291–93.) The Indiana Board wholly rejected the multiple regression analysis, however, stating:

> [Kimball's] failure to explain coherently the methodology employed by the software program in generating the multiple regression analysis deprives both the Board and the Respondent of the ability to assess its reliability. The Board therefore assigns no evidentiary weight to the multiple regression analysis.

(Cert. Admin. R. at 43.) Because the parties have not contested that finding, the Court need not discuss the analysis in further detail.

**6.** As part of his calculation, Mr. Feicht examined rental rates of five "properties similar to the subject located throughout Indiana that would have competed with the subject property as of the date of valuation." (Cert. Ad-

64 (footnote added).) In so doing, Mr. Feicht utilized a 13.183% capitalization rate (which accounted for a pessimistic market, taxes, and a decrease in tenant desirability) and a 35% vacancy rate. Under the sales comparison approach, Mr. Feicht examined sales data from six properties similar to the subject property. *(See* Cert. Admin. R. at 252–53.) Mr. Feicht adjusted the sales prices of the comparable properties to account for differences between those properties and the subject property (i.e., condition, grade, age, size, height, land area, and land cost); the sales prices were also adjusted to reflect the 1999 value of those properties. *(See* Cert. Admin. R. at 252–53.) Based on the adjusted sales prices, Mr. Feicht concluded that the value of the subject property was $1,650,000. (Cert. Admin. R. at 253.) Mr. Feicht then reconciled the three estimates of value to arrive at a final estimate of value of $1,685,000.[7] (Cert. Admin. R. at 265 (footnote added).)

Also during the administrative hearing, Mr. Tracey Carboni, Kimball's tax representative, submitted letters from Kimball's realtor, the Hart Corporation (Hart). *(See* Cert. Admin. R. at 115–120, 288–91.) Hart listed the subject property for sale beginning in 2002. In its letters to Kimball, Hart discussed the difficulty and inability to sell the property for Kimball's initial asking price of $2,500,000. The letters also indicated that Kimball reduced the asking price to $1,500,000 in 2004. *(See* Cert. Admin. R. at 120, 291.)

In its final determination, the Indiana Board concluded that the appraisal and the Hart letters constituted probative evidence of the property's market value-in-use. Specifically, the Indiana Board stated that on its face, the appraisal indicated that it was prepared in accordance with USPAP standards, and it estimated the market value of the property using the three generally accepted methods of appraisal as outlined in the Manual. (Cert. Admin. R. at 41–42.) The Indiana Board also noted that the appraisal provided at least some evidence that the estimate of value was related to a January 1, 1999 value. (Cert. Admin. R. at 42.) In addition, the Indiana Board held that the letters from Hart, indicating that Kimball was unable to sell the property for $2,500,000, were indicative "that the subject property's [actual] market value-in-use was less than its assessed value of $2,595,200."[8] (Cert. Admin. R. at 42 (footnote added).) Consequently, the Indiana Board held that Kimball presented evidence sufficient to prima facie establish that its assessment was incorrect and to shift the burden to the Assessor to rebut that evidence. (Cert. Admin. R. at 43.)

On rebuttal, the Assessor questioned the reliability of the appraisal. *(See* Cert. Admin. R. at 298–338.) Specifically, the Assessor's witness, Mr. Tim Vankirk, an MAI appraiser, argued that the appraisal's in-

---

min. R. at 262.) Mr. Feicht adjusted the rental rates to reflect a January 1, 1999 value using a Consumer Price Index. (Cert. Admin. R. at 262.)

7. In the appraisal, Mr. Feicht stated:
[i]n developing the final estimate of value, the greatest consideration has been given to the sales comparison approach with support from the income approach, at least as to a test of reasonableness. The cost approach was deemed most unreliable due to

the age and location of the subject and the inability to adequately estimate all forms of depreciation.
(Cert. Admin. R. at 265.)

8. Nevertheless, the Indiana Board assigned no weight to Kimball's subsequent reduction in its asking price to $1,500,000 in 2004 because the reduction took into account market conditions beyond the assessment date. (Cert. Admin. R. at 42, 47.)

come approach (1) improperly employed a 35% vacancy rate based on post–2002 market data; and (2) failed to explain and support Mr. Feicht's decision to increase the capitalization rate by 2.5% to account for a decline in tenant desirability. The Indiana Board agreed with Mr. Vankirk's criticisms and, therefore, assigned very little weight to the income approach.[9] *(See* Cert. Admin. R. at 46–47 (footnote added).) Nevertheless, the Indiana Board found that other portions of the appraisal, particularly the sales comparison approach, were still probative as to the property's market value-in-use. As a result, the Indiana Board held that because the

Assessor did not present any market value-in-use evidence to contradict Kimball's evidence, the assessment should be reduced to $1,685,000 to reflect the only market value-in-use evidence in the record.

■ In its appeal to this Court, the Assessor claims that the Indiana Board's determination was not supported by substantial evidence because Kimball did not make a prima facie case. More specifically, the Assessor contends that the Indiana Board ignored the unreliability of Kimball's appraisal and merely accepted the appraisal at face value without any explanation by Kimball as to its contents or the reliability thereof.[10] *(See* Pet'r Br. at 1

**9.** The Assessor also claimed the reliability of the appraisal was compromised because Mr. Feicht did not personally inspect the subject property nor did he include an extraordinary assumption noting that information in the appraisal, which violated USPAP Standard Rule 1–2(e)(v). *(See* Cert. Admin. R. at 277, 304–06.) Instead, Mr. Feicht used information gathered by Mr. Carboni to compile the appraisal report. To support its position, Mr. Vankirk submitted a one-page excerpt of the applicable USPAP rule.

The Indiana Board rejected the argument because the comment to the rule indicated that an appraiser may gather information concerning property characteristics from a reliable third-party without including an extraordinary assumption in the appraisal. *(See* Cert. Admin. R. at 45, 277.) The Indiana Board held that Mr. Feicht's reliance on Mr. Carboni's inspection of the property was consistent with the requirements of the rule because Mr. Carboni is an Indiana tax representative with many years experience in inspecting buildings. (Cert. Admin. R. at 45–46.)

Mr. Vankirk also questioned Mr. Feicht's credibility as an appraiser. In particular, Mr. Vankirk (and the Assessor's attorney, Ms. Marilyn Meighen) argued (1) because Mr. Feicht was not licensed as an appraiser in Indiana, he did not conform to USPAP standards; and (2) even though Mr. Feicht was paid on a salaried basis, his employer was compensated based on a contingency fee and, therefore, Mr. Feicht was unable to give an

objective opinion of value. *(See* Cert. Admin. R. at 277, 298–300.)

The Indiana Board found that while the Assessor did not establish how the lack of an Indiana license detracts from Mr. Feicht's credibility, Mr. Feicht's failure to obtain a temporary Indiana license indicated a lack of care on his part and detracted "somewhat" from the reliability of his opinion of value. (Cert. Admin. R. at 44.) The Indiana Board also found that the fact that Mr. Feicht's employer is compensated on a contingent basis did not impair his ability to objectively appraise the subject property. (Cert. Admin. R. at 44 (stating that Mr. Vankirk testified that the arrangement would not prevent Mr. Feicht from rendering an objective opinion of value).)

**10.** The Court must note that the Assessor's assertion is simply untrue. In this case, the Indiana Board did not merely accept the appraisal as "gospel," so to speak. Instead, the Indiana Board stated sound reasons for concluding that the appraisal was probative. *(See* Cert. Admin. R. at 41–43.) In addition, as mentioned, the Indiana Board agreed with some of the Assessor's criticisms concerning certain parts of the appraisal (particularly the income approach) and, therefore, assigned little or no weight to those portions of the appraisal. *(See* Cert. Admin. R. at 46–48.) Furthermore, the Indiana Board reasonably dealt with all of the evidence and claims made during the hearing. *(See* Cert. Admin. R. at 35–48.)

(stating that "this case is about the [Indiana Board's] way of thinking about appraisals[; i]t is about the [Indiana] Board reviewing the presentation of evidence instead of the evidence itself") (footnote added).) To support its claim, the Assessor cites to some of this Court's previous opinions upholding an Indiana Board final determination that a taxpayer did not establish a prima facie case because the taxpayer failed to provide a thorough presentation of its own evidence. (See Pet'r Br. at 6–7, 13) *(citing e.g., Long v. Wayne Twp. Assessor,* 821 N.E.2d 466, 471 (Ind. Tax 2005) (explaining that taxpayers have the duty to walk the Indiana Board through every element of its analysis; thus, taxpayers cannot simply cite to the record as though the evidence speaks for itself).) Those holdings, however, do not have the same applicability in the case at bar.

 The cases to which the Assessor cites involve situations where a taxpayer challenges the Indiana Board's determination that it did not establish a prima facie case. Consequently, those decisions stand for the proposition that the taxpayer is required to make the Indiana Board (as the finder of fact) understand its evidence in order for the evidence to be considered probative—in other words, the taxpayer must make its evidence work for it.[11] Accordingly, in those cases, the Court will not overturn an Indiana Board determina-

tion denying an appeal if the taxpayer did not, as a threshold matter, adequately present its evidence at the administrative hearing. If, however, the Indiana Board understands the evidence presented and determines it has probative value, the Court typically will not overturn a determination that a taxpayer established a prima facie case, absent an abuse of discretion.[12]

 As the party challenging the propriety of an Indiana Board final determination, the Assessor bears the burden of demonstrating its invalidity. *See Elkhart Maple Lane Assocs.,* 789 N.E.2d at 111. While the evidence the Assessor presented during the administrative hearing impeached Kimball's evidence to some degree, it was not enough to fully rebut Kimball's remaining market value-in-use evidence in the record.[13] Moreover, because the Assessor did not present market value-in-use evidence to contradict Kimball's showing, it failed to satisfy its burden.

## CONCLUSION

 For the above stated reasons, the Indiana Board's final determination is AFFIRMED.[14]

---

**11.** As a point of clarification, the applicable burden assigned to each party is dictated by the role of the petitioner and respondent at each level of the appeals process. Therefore, if an assessor were the petitioner challenging a PTABOA assessment determination to the Indiana Board, that assessor's burden would be the same as the taxpayer's in the aforementioned example.

**12.** In this case, the Indiana Board understood Kimball's evidence and was able to assess the probative value as the contents of the appraisal provided an explanation of the methods

and information used to derive the estimate of value. *(See* Cert. Admin. R. at 224–76.)

**13.** As evidenced by this case, assessing officials should be prepared to defend their assessments by providing their own evidence of value at the administrative level, rather than counting on a taxpayer's failure to make a prima facie case.

**14.** When determining whether an administrative decision is supported by substantial evidence, the reviewing court must determine

from the entire record whether the agency's decision lacks a reasonably sound evidentiary basis. *Crooked Creek Conservation and Gun Club, Inc. v. Hamilton County N. Bd. of Zoning Appeals*, 677 N.E.2d 544, 548–49 (Ind.Ct. App.1997), *trans. denied.* Therefore, evidence will be considered substantial if it is more than a scintilla and less than a preponderance or if it would be accepted as adequate to support a conclusion by a reasonable mind. *Id.* at 549. In this case, based on the entire record, Kimball's probative evidence was more than a scintilla and enough that a reasonable mind could accept the conclusion that the original assessment was erroneous.