**GRANT COUNTY ASSESSOR,**
Petitioner,

v.

**KERASOTES SHOWPLACE THEATRES, LLC,**
Respondent.

No. 49T10–0908–TA–47.

Tax Court of Indiana.

Oct. 20, 2011.

Marilyn S. Meighen, Meighen & Associates, PC, Carmel, IN, Attorney for Petitioner.

Vickie L. Norman, Brent A. Auberry, Daniel R. Roy, Baker & Daniels LLP, Indianapolis, IN, Attorneys for Respondent.

FISHER, Senior Judge.

On July 15, 2009, the Indiana Board of Tax Review (Indiana Board) issued a final determination valuing the Kerasotes Showplace 12 in Grant County, Indiana (the subject property) at $4,200,000 for the 2006 assessment. The Grant County Assessor (Assessor) now challenges that final determination.

## RELEVANT FACTS AND PROCEDURAL HISTORY

The subject property is a 12-screen multiplex movie theater located on approximately seven acres of land near the North Park Mall in Marion, Indiana. Kerasotes Showplace Theatres, LLC (Kerasotes) built the facility in 2000 at a cost of $6,487,110.[1]

In 2005, Kerasotes sold the subject property, along with sixteen other theaters it owned throughout the Midwest, in a portfolio transaction. Crest Net Lease, Inc. (Crest Net) purchased the portfolio for $200 million, allocating $7,821,835 to the sale of the subject property. As a term of the sale, Kerasotes agreed to lease back the properties it sold to Crest Net. Pursuant to their agreement, Kerasotes paid Crest Net an annual rent of $633,569 (or $17.70 per square foot) for the subject property.[2]

For the 2006 assessment, the Assessor assigned the subject property an assessed value of $6,137,800. Believing that value to be too high, Kerasotes filed an appeal with the Grant County Property Tax Assessment Board of Appeals (PTABOA). The PTABOA increased the assessment to $7,821,000. Kerasotes subsequently filed an appeal with the Indiana Board.

On February 4, 2009, the Indiana Board conducted an administrative hearing on the appeal. During the hearing, both Kerasotes and the Assessor presented appraisals, each of which was completed in conformance with the Uniform Standards of

---

1. Kerasotes' land costs are included in this figure. (*See* Cert. Admin. R. at 145–46.)

2. The lease for the subject property is a triple net lease; Kerasotes, as the tenant, is therefore responsible for all expenses except major exterior/structural expenses and management expenses. (*See* Cert. Admin. R. at 155.) *See also* Appraisal Institute, The Appraisal of Real Estate 477 (12th ed.2001) (explaining that a triple net lease generally requires the landlord to pay for structural repairs, while the tenant pays for utilities, property taxes, insurance, and property maintenance). The lease is valid for a twenty year term, with three five-year extension options available after that.

Professional Appraisal Practice (USPAP) and valued the subject property as of January 1, 2005.[3] Each of the appraisals, however, arrived at a substantially different value for the subject property. The parties agree that the difference in the appraisals' values is essentially the result of how much their appraisers relied on the subject property's allocated sales price and contract rent in their income approach analyses.[4] (*See generally* Pet'r Br. at 2; Resp't Br. at 9 (footnote added).)

Kerasotes' appraisal determined that the market value-in-use of the subject property was $4,200,000. In arriving at that value, Kerasotes' appraiser gave the subject property's allocated sales price and contract rent little weight.

During the administrative hearing, Kerasotes' appraiser explained that sale-lease-back transactions, which are prevalent in the movie theater industry, are typically used as financing tools and, as a result, often represent the sale of more than just the value of the real property involved.[5] (*See* Cert. Admin. R. at 121, 491–93 (footnote added).) Accordingly, he believed it was necessary to determine whether the subject property's allocated sales price—as reflected through its contractual rent—represented the sale of the real property at issue alone, or if it represented the sale of something more. To that end, he explained that all seventeen properties sold in the portfolio transaction were fully equipped and had, for the most part, been in operation under the Kerasotes brand name for at least five years. (Cert. Admin. R. at 98.) Kerasotes' appraiser also noted that there was no evidence indicat-

---

**3.** In 2006, Indiana's real property tax assessments were to reflect a property's "market value-in-use" as of January 1, 2005. *See* Ind. Code § 6-1.1-31-6(c) (2006); 2002 Real Property Assessment Manual (2004 Reprint) (Manual) (incorporated by reference at 50 Ind. Admin. Code 2.3-1-2 (2002 Supp.)) at 2; 50 Ind. Admin. Code 21-3-3(b) (2006) (*see* http://www.in.gov/legislative/iac/). Market value-in-use is the value of a property "for its current use, as reflected by the utility received by the owner or a similar user, from the property." Manual at 2. *See also* Manual at 3 (explaining that market value-in-use is synonymous with "use value," *i.e.*, "[t]he value a specific property has for a specific use" (emphasis omitted)).

Generally, a property's market value-in-use "may be thought of as the ask price of property by its owner, because this value ... represents the utility obtained from the property [ ] and ... how much utility must be replaced to induce the owner to abandon the property." *Id.* at 2. In markets where property types are frequently exchanged and used by both buyer and seller for the same general purpose, a sale will be representative of utility and market value-in-use will equal value-in-exchange. *Id.* at 2.

**4.** Both Kerasotes' appraisal and the Assessor's appraisal also utilized the cost approach and the sales comparison approach to estimate the value of the subject property; both appraisals, however, concluded that the estimate of value derived under the income approach was the most reliable. (*See* Cert. Admin. R. at 166, 427.)

**5.** Indeed, Kerasotes' appraiser testified that in order to compete with the burgeoning "home entertainment industry," movie theater operators require and seek an influx of capital to update facilities and equipment technology. (*See* Cert. Admin. R. at 487–92.) Conversely, "[o]ver the past ten years, a national investment market in net lease properties has evolved as more international investment capital [has entered the marketplace,] seeking placement in commercial real estate associated with national brands with established operating records." (Cert. Admin. R. at 491.) "[As d]emand for net lease properties has [ ] increased, [ ] capitalization rates [are] lower and investment prices [are] higher." (Cert. Admin. R. at 492.) "This trend has resulted in divergence between lease fee and fee-simple values of net lease properties because of the premium placed on these properties by national investors ... [who are] looking at the income of the business to justify the rent that they're going to receive." (Cert. Admin. R. at 492–93.)

ing that Crest Net had paid a separate consideration for either the intangible value attributable to the nationally-branded movie theater or for the furniture, fixtures, and equipment in the subject property. (Cert. Admin. R. at 123, 500, 537.) (*See also* Cert. Admin. R. at 344–54 (Kerasotes' personal property tax returns for the 2005 and 2006 tax years).) Additionally, he indicated that Crest Net had used an outside financial institution to determine the overall value of Kerasotes' portfolio as well as the allocated sales prices for each of the seventeen theaters. (Cert. Admin. R. at 326, 560–61.) Finally, he explained that as an industry "rule of thumb," a movie theater will typically rent for approximately 11.5% of its gross revenue; Kerasotes' rent, in contrast, represented 27% of the subject property's gross revenue. (*See* Cert. Admin. R. at 123–24, 500, 538–39.) Collectively, these factors led Kerasotes' appraiser to conclude that the subject property's contractual rent (and thus its allocated purchase price) reflected more than just the value of the subject property's real property: they also included the buyer's purchase of certain economic interests associated with the tenant's operation of the subject property as a movie theater. (*See, e.g.,* Cert. Admin. R. at 491–93, 529–31, 537–39.)

Based on this conclusion, when Kerasotes' appraiser valued the subject property under the income approach, he used income data that represented the "traditional" theater rental market (*i.e.,* not sale-leaseback transactions). More specifically, he used a market rent of $11 per square foot[6] to value the subject property, not the actual contract rent of $17.70 per square foot. By using such data, he believed he was best able to "isolate" the value for the subject's real property, and real property alone, at $4,200,000.

In contrast, the Assessor's appraisal estimated the market value-in-use of the subject property at $7,450,000. The Assessor's appraiser relied heavily on the subject property's allocated sales price and contractual rent to arrive at his value conclusion.

During the Indiana Board hearing, the Assessor's appraiser maintained that because sale-leaseback transactions were the norm within the industry, such transactions presented the best data by which to gauge true market rental rates for movie theaters. (Cert. Admin. R. at 427, 695–96, 711–12.) Accordingly, he compared the subject property's contract rent with those of six comparable movie theaters throughout the country that had been sold pursuant to sale-leaseback transactions, determining that they all were within a consistent range.[7] (*See* Cert. Admin. R. at 417–22, 424, 612–13, 696, 711–13 (footnote added).) As a result, the Assessor's appraiser concluded that the subject property's allocated sales price and contract rent were reliable indicators of the subject property's market value-in-use. (*See* Cert. Admin. R. at 424, 618–19, 652.) He asserted that his conclusion was corrobo-

---

6. This figure was primarily based on the blending of rents paid for an older theater in Valparaiso, Indiana ($7.87/square foot), a new mega-plex in Plainfield, Indiana ($23.18/ square foot), and another Kerasotes theater property in Indianapolis, Indiana ($13.50/ square foot). (*See* Cert. Admin. R. at 156–58, 539–45, 547.) Kerasotes' appraiser tested this rent value conclusion *via* a lease constant analysis, which was performed in conjunction

with his cost approach to value. (*See* Cert. Admin. R. at 149, 526–29, 548–49.)

7. The six properties, which were all sold in sale-leaseback transactions, generated rents between $11 and $24 per square foot. (Cert. Admin. R. at 424.) One of those six properties was sold as part of the same portfolio transaction as the subject property. (*Cf.* Cert. Admin. R. 369 *with* 424.)

rated by the following: 1) the lease between Kerasotes and Crest Net did not indicate that it was a financing lease, capital lease, or deed of trust; 2) the furniture, fixtures and equipment belonged to Kerasotes; and 3) in 2008, Crest Net sold the subject property in a sale-leaseback transaction for $7,679,620. (*See* Cert. Admin. R. at 580–88, 590–93.)

On July 15, 2009, the Indiana Board issued its final determination in the matter. In the final determination, the Indiana Board explained that based on what the evidence did, and did not, show, it could not conclude that the subject property's allocated sales price/contract rent reflected the value of the subject's real property alone. More specifically, the Indiana Board based its conclusion on the following: the evidence did show that the subject property's contract rent was significantly higher than the industry's market standard; the evidence did not show, however, how Crest Net actually determined the allocated sale price for the subject property. (Cert. Admin. R. at 42 ¶ 69.) Consequently, the Indiana Board found the appraisal submitted by Kerasotes to be more probative as to the subject property's market value-in-use than the Assessor's appraisal and reduced its 2006 assessed value to $4,200,000.

The Assessor initiated this original tax appeal on August 31, 2009. The Court heard the parties' oral arguments on June 11, 2010. Additional facts will be supplied when necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. *Osolo Twp. Assessor v. Elkhart Maple Lane Assocs.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE § 33–26–6–6(e)(1)–(5) (2011).

■ In reviewing an Indiana Board decision, the Court will defer to its factual findings as long as they are supported by substantial evidence; the Court will review any questions of law arising from the Indiana Board's factual findings de novo.[8] *Cedar Lake Conf. Ass'n v. Lake Cnty. Prop. Tax Assessment Bd. of Appeals*, 887 N.E.2d 205, 207 (Ind. Tax Ct.2008) (citations omitted) (footnote added), *review denied*. The Court will not reweigh the evidence nor will it judge the credibility of witnesses. *See Freudenberg–NOK Gen. P'ship v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1026, 1030 (Ind. Tax Ct.1999) (citations omitted), *review denied*.

### Discussion

■ On appeal, the Assessor argues that the Indiana Board erred in adopting the value estimate contained in Kerasotes'

---

8. Evidence will be considered substantial when, *inter alia*, "it would be accepted as adequate to support a conclusion by a reasonable mind." *French Lick Twp. Tr. Assessor v. Kimball Int'l, Inc.*, 865 N.E.2d 732, 739 n. 14 (Ind. Tax Ct.2007) (citation omitted).

appraisal over the value estimate contained in its appraisal. More specifically, the Assessor contends that because Kerasotes' appraisal ignored the data representing the "realities" of the movie-theater industry (*i.e.*, rents received in sale-lease-back transactions), it failed to consider and value the actual utility gained from the use of the subject property and, as a result, failed to value the subject property pursuant to Indiana's market value-in-use standard. (*See* Pet'r Br. at 1–2.) In other words, the Assessor argues that because a property's market value-in-use reflects the "ask price by its owner," *see supra* note 3, Kerasotes, "operating as the seller of the property in 2005 would not have taken less than the price equal to the utility gained it ... [*i.e.*,] the allocated $7,821,835 sale price." [9],[10] (Pet'r Br. at 12–13 (footnotes added).) The Assessor's argument, however, misses the mark.

The issue presented to the Indiana Board to decide was whether, under Indiana's market value-in-use standard, the subject property should be valued according to the terms of its lease (*i.e.*, contract rent) or according to what other similar properties would garner in rent (*i.e.*, market rent). (*See* Cert. Admin. R. at 39 ¶ 61.) Noting that there were no Indiana cases that provided guidance, the Indiana Board found a case, decided by the Wisconsin Supreme Court, to be particularly helpful in its analysis. (*See* Cert. Admin. R. at 39–41 ¶¶ 62–65.) The Indiana Board

noted that, in that case, the Wisconsin Supreme Court held that under the income approach, leased properties were to be valued in accordance with market rents despite the fact that their contract rents were much higher. (Cert. Admin. R. at 39 ¶ 62 (*citing Walgreen Co. v. City of Madison*, 311 Wis.2d 158, 752 N.W.2d 687, 701, 703 (2008)).) The Wisconsin Supreme Court explained that its holding was consistent with the "nationally recognized principle" as set forth in *The Appraisal of Real Estate:*

> A lease never increases the market value of real property rights to the fee simple estate. Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and even though the rights may legally "run with the land" they constitute contract rather than real property rights. Conversely, detrimental aspects of a lease may result in a situation in which either or both of the parties to the lease, and their corresponding value positions, may be diminished.

(Cert. Admin. R. at 40 ¶ 64 (*citing Walgreen Co.*, 752 N.W.2d at 703) (emphasis omitted).)

As the Indiana Board noted, while Indiana's assessment system does not value property according to its fair market value like Wisconsin's assessment system, it nonetheless does not "allow[ ] assessors

---

**9.** The Assessor's appraiser indicated that he believed the subject property to be a special-purpose property. (*See* Cert. Admin. R. at 405, 619.) A special-purpose property is "[a] limited-market property with unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built." REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002—VERSION A (2004 Reprint) (Guidelines) (incorporated by reference at 50 IAC 2.3–1–2), Bk. 2, App. F at 17 (emphasis omitted). "Examples are steel mills, theaters, auditoriums, and churches."

*Id.*, Bk. 2, Glossary at 19. The buyer's "ask price" generally represents the market value-in-use of a special-purpose property. *See id.*, Bk. 2, App. F at 17–18.

**10.** The Assessor complains that by adopting Kerasotes' appraisal, the Indiana Board instead adopted a value "more representative of a market value for a second generation user, not a value[-in-]use." (*See* Cert. Admin. R. at 638.)

to assess things other than real property rights for ad valorem taxation." (Cert. Admin. R. at 41 ¶ 66). *Accord Stinson v. Trimas Fasteners, Inc.*, 923 N.E.2d 496, 501 (Ind. Tax Ct.2010) (where this Court stated that pursuant to Indiana's assessment manual, "market value-in-use, as determined by objectively verifiable market data, is the value of a property *for* its use, not the value *of* its use").[11] Given the uncontroverted testimony that sale-leaseback transactions often reflect the sale of more than just real property, the Indiana Board explained that one should approach the rental data from such transactions with caution, taking care to ascertain whether the sales prices/contract rents reflect real property value alone or whether they include the value of certain other economic interests. (*See* Cert. Admin. R. at 37–38 ¶¶ 57–58.) The Indiana Board determined that because Kerasotes' appraiser exercised that caution in his income approach, while the Assessor's appraiser did not, Kerasotes' appraisal was therefore more probative than the Assessor's appraisal. (*See* Cert. Admin. R. at 37–38 ¶¶ 57–58.)

Based on its review of the certified administrative record, the Court does not disagree with the Indiana Board. Indeed, in identifying and utilizing comparable rental properties in his income analysis, Kerasotes' appraiser avoided those that had been sold in sale-leaseback transactions entirely. (Cert. Admin. R. at 156–58, 539–547.) In contrast, the Assessor's appraiser indicated that all of his comparables had been sold pursuant to sale-leaseback transactions. (Cert. Admin. R. at 417–22, 424, 711–13.) Moreover, the Assessor's appraiser never claimed that he made any inquiry into whether those "comparable" transactions involved the sale of

real property interests alone or if they *too* involved the sale of other economic interests. (*See, e.g.*, Cert. Admin. R. at 573–621.)

The certified administrative record also demonstrates that while the Assessor's appraiser assumed the 2005 Kerasotes portfolio sale was an "arm's length transaction" (as opposed to a financing tool used to obtain capital for purposes of updating theaters and equipment (*see supra* note 5)), his assumption was based on the fact that he "didn't get any kind of indication that it was[n't]." (*See* Cert. Admin. R. at 619–20, 673.) Furthermore, his reliance on the allocated value of $7,821,835 was made without any consideration as to how, or what factors, were considered in arriving at that value. (Cert. Admin. R. at 368, 585, 593–95.) Finally, during the course of his testimony, the Assessor's appraiser actually acknowledged that the subject property's contractual lease payments probably incorporated a value beyond the revenue stream attributable to the subject property. (*See* Cert. Admin. R. at 601 (testifying that given Kerasotes' "willingness to lease back [the] property . . . [it believed] that [it] could be successful in this location"), 608–09 (indicating that if the contract rent had been lower than market rent, it would probably indicate that Kerasotes could not offer what other movie theaters offered (*i.e.*, its business operation was not competitive), 616–17 (explaining that he believed the income approach was the best way to estimate the value of the subject property because it measured "the income stream that is being generated *by [ ] Kerasotes*") (emphasis added)).)

██ "The valuation of property is the formulation of an opinion; it is not an exact science. When there are competing

---

11. Thus, the Court rejects the Assessor's contention that, given Wisconsin's assessment of property on the basis of its fair market value, the Indiana Board's reliance on the Wisconsin case was improper.

opinions as to how a property should be valued, the Indiana Board must determine which opinion is more probative." *Stinson*, 923 N.E.2d at 502. "That determination is, essentially, the result of how effectively each party has persuaded the Indiana Board that its value opinion is more credible and reliable than that of the other." *Id.* In this case, the Indiana Board found that in determining what the subject property's assessed value should be, the appraisal offered by Kerasotes was more persuasive than the appraisal offered by the Assessor. On appeal, the Assessor has essentially asked the Court to reweigh that evidence. This, however, the Court cannot do. *See Freudenberg–NOK*, 715 N.E.2d at 1030. *See also French Lick Twp. Tr. Assessor v. Kimball Int'l, Inc.,* 865 N.E.2d 732, 739 (Ind. Tax Ct.2007) (explaining that where the Indiana Board has understood a taxpayer's evidence and determined that it has probative value, the Court will not overturn that decision absent an abuse of discretion).

## CONCLUSION

Based on the foregoing reasons, the Indiana Board's final determination in this matter is AFFIRMED.