ATTORNEYS FOR PETITIONER:
**MATTHEW M. ADOLAY**
WOODEN McLAUGHLIN LLP
Indianapolis, IN

**THOMAS M. ATHERTON**
BOSE McKINNEY & EVANS LP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**WINSTON LIN**
**MEREDITH B. McCUTCHEON**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

FILED
Nov 25 2019, 1:59 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| SOUTHLAKE INDIANA LLC, | ) | |
| Petitioner, | ) | |
| v. | ) | Cause No. 18T-TA-00016 |
| LAKE COUNTY ASSESSOR, | ) | |
| Respondent. | ) | |

ON APPEAL FROM A FINAL DETERMINATION
OF THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**November 25, 2019**

WENTWORTH, J.

Southlake Indiana LLC challenges the Indiana Board of Tax Review's final determination that valued its real property for each of the 2007 through 2014 tax years. Upon review, the Court reverses the Indiana Board's final determination.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

Southlake owns a 7.23 acre parcel with a 90,000 square-foot, two-story building located in a premier retail location in Merrillville, Indiana. (See Cert. Admin. R. at 282, 576.) The property is a freestanding outlot building of the Southlake Mall, a large regional mall with several anchor stores. (See Cert. Admin. R. at 293, 845-54.) The property sits near a heavily traveled intersection at US 30 and Mississippi Street, with access and visibility from both streets. (See Cert. Admin. R. at 573-74, 577.)

In 1992, Southlake entered into a build-to-suit lease with a Kohl's discount department store, which was renewed in 2012. (See Cert. Admin. R. at 397-98, 1457-58, 1707.) In its build-to-suit leases, Kohl's requires its properties to be developed according to its national specifications. (See Cert. Admin. R. at 1704-06.) To determine a rental rate, Kohl's applies a mortgage constant to the construction costs, compensating both the developer and owner for their investments. (See Cert. Admin. R. at 1706.) Under the terms of the Southlake lease, Kohl's paid a fixed rental rate plus an additional 1.5% of its retail sales above $14,500,000. (See Cert. Admin. R. at 397, 546.)

For each tax year from 2007 through 2012, the Lake County Assessor valued the property at $16,775,300 and for 2013 and 2014 valued the property at $13,700,000. (See Cert. Admin. R. at. 533-34.) Believing those values to be too high, Southlake filed appeals with the Lake County Property Tax Assessment Board of Appeals ("PTABOA"), which reduced the assessments to $11,600,000 (2007); $12,500,000 (2008); $15,200,000 (2009); $11,500,000 (2010); $12,000,000 (2011); $12,700,000 (2012); $13,700,000 (2013); and $13,700,000 (2014). (See Cert. Admin. R. at 4, 12, 23, 38, 51, 64, 78, 81-

2

82, 87.) Still believing the property was over-assessed, Southlake appealed to the Indiana Board.

In February and December of 2016, the Indiana Board conducted its hearing on Southlake's appeals. The parties each presented appraisals that valued the property using the cost, sales comparison, and income approaches to value; both appraisals, however, relied primarily on the income approach[1] on the basis that investors would be the most likely purchasers of the property. (See Cert. Admin. R. at 445, 551, 738-42, 1474, 2162.)

<u>Coers Appraisal</u>

Southlake presented a USPAP-compliant appraisal prepared by Sara Coers, a member of the Appraisal Institute (MAI). (See Cert. Admin. R. at 274-75.) In her income approach, she estimated the subject property's rent using three different methods: 1) averaging extracted market rents of other Indiana properties, 2) calculating rent as a percentage of gross sales, and 3) calculating a cost-based rent. (See Cert. Admin. R. at 400-17, 1459-65.) Based on these methods, Coers determined that the subject property's contract rent was actually below market rents that ranged from $5.50 to $7.00 per square foot. (See Cert. Admin. R. at 397, 416-17.)

After accounting for expenses, Coers concluded that the property's net operating income (NOI) ranged from $4.88 to $6.09 per square foot. (See Cert. Admin. R. at 423-

---

[1] The income approach "is used for income producing properties that are typically rented[, and] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." See 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 3; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2.

3

30, 1470-71.) She then selected loaded overall capitalization rates ranging from 7.15% to 8.65% that were based on rates extracted from market sales in Indiana, Ohio, and Kentucky as well as investor surveys. (See Cert. Admin. R. at 432-40, 1471-73.) After applying the capitalization rates to her NOI values, Coers estimated the property's market value-in-use as follows: $6,460,000 (2007); $6,240,000 (2008); $5,350,000 (2009); $5,090,000 (2010); $5,970,000 (2011); $6,500,000 (2012); $7,050,000 (2013); and $7,160,000 (2014). (Cert. Admin. R. at 438-39, 1473.)

Kenney Appraisal

The Assessor presented a USPAP-compliant appraisal prepared by Mark Kenney, MAI. (See Cert. Admin. R. at 525-28, 1739-40, 1760.) In his income approach, Kenney assumed that both the subject property's category and its location near the Southlake Mall limited the types of comparable leases to those with similar users. (See Cert. Admin. R. at 576, 2286-87, 2289-90.) Kenney then concluded that the subject property's highest and best use was as a discount department store and that leased fee sales were the most relevant comparable sales for estimating its market rent. (See Cert. Admin. R. at 551.)

Kenney averaged market rents extracted from sale-leaseback and build-to-suit leases of several Kohl's stores and other national discount department stores and big box stores, estimating that the market rent ranged between $9.00 to $10.50 per square foot. (See Cert. Admin. R. at 655-68.) Using these market rent estimates, Kenney concluded that the property's NOI ranged from $8.19 to $9.58 per square foot during the years at issue. (See Cert. Admin. R. 674-81.)

Finally, Kenney developed overall capitalization rates that ranged from 6.7% to 7.6%. (See Cert. Admin. R. at 674-81.) He applied the capitalization rates to his NOI

4

estimates to arrive at final values for the subject property of $11,700,000 (2007); $11,800,000 (2008); $10,900,000 (2009); $12,100,000 (2010); $12,100,000 (2011); $11,000,000 (2012); $12,300,000 (2013); and $13,000,000 (2014). (See Cert. Admin. R. at 714-16.)

<u>The Indiana Board's Final Determination</u>

On May 10, 2018, the Indiana Board issued a final determination. In it, the Indiana Board assigned no weight to either party's sales comparison or cost approaches. (See Cert. Admin. R. at 3372 ¶ 130, 3379 ¶ 151.) In considering each appraisal's income approach, the Indiana Board noted that Kenney provided a more detailed market rent analysis than Coers by offering more relevant comparable properties. (See Cert. Admin. R. at 3374-75 ¶¶ 136-37 (stating that Coers's reliance on a month-to-month lease for a fireworks store in a soon-to-be demolished building cast significant doubt on her analysis).) To determine which appraiser's estimate of market rent was best supported, however, the Indiana Board used its own unique evaluation method.

First, the Indiana Board selected sixteen leases, five from Coers's data and eleven from Kenney's data, that it found most relevant to the subject property's market. (See Cert. Admin. R. at 3374-75 ¶ 137.) Of those leases, nine were Kohl's build-to-suit leases from various locations across the United States with rents ranging from $6.40 to $11.97 per square foot, and two leases involved properties that were located close to the subject property (i.e., Gander Mountain and The RoomPlace) with rents of $7.42 and $9.75 per square foot. (See Cert. Admin. R. at 3374-76 ¶¶ 137-39.)

Next, the Indiana Board compared the rents from its selected leases with Coers's and Kenney's estimated market rents and concluded that Kenney's estimates were better

5

supported than Coers's. (See Cert. Admin. R. at 3376 ¶ 140.) The Indiana Board explained that once it "corrected" and "reconstructed" Coers's gross sales percentage rent analysis, Coers's rent estimates themselves supported Kenney's. (See Cert. Admin. R. at 3376-77 ¶¶ 141-43 (stating that Coers's analysis was flawed because she based her findings on gross rent clauses and not rent as a percentage of gross sales).)

Finding Kenney's estimated market rents more credible, the Indiana Board adopted Kenney's income approach values.[2] As a result, the Indiana Board valued the property as follows: $11,700,000 (2007); $11,800,000 (2008); $10,900,000 (2009); $9,600,000 (2010); $9,600,000 (2011); $10,400,000 (2012); $12,300,000 (2013); and $13,000,000 (2014). (See Cert. Admin. R. at 3380 ¶ 153.)

Southlake initiated this original tax appeal on June 22, 2018. The Court conducted oral argument on December 20, 2018. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, Southlake must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5)

---

[2] The Indiana Board substituted Coers's capitalization rates for Kenney's in 2010, 2011, and 2012 because Kenney's were actually below the ranges of rates selected in his own data. (See Cert. Admin. R. at 3378-79 ¶¶ 149-50.)

6

(2019).  On review, however, the Court may not reweigh or assess the credibility of evidence absent finding an abuse of discretion.  See Clark Cty. Assessor v. Meijer Stores LP, 119 N.E.3d 634, 642 (Ind. Tax Ct. 2019).

## LAW

In  Indiana, real property is assessed on  the  basis  of  its  "market value-in-use." 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 2; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) at 2.   See also IND. CODE § 6-1.1-31-6(c) (2007) (amended 2016).  Market value-in-use is defined as the value "of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." 2002 Manual at 2; 2011 Manual at 2.  Because Indiana's property tax system taxes the value of real property – and not business value, investment value, or the value of contractual rights – this Court has explained that "market value-in-use, as determined by objectively verifiable market data, is the value of a property for its use, not the value of its use."  Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 501 (Ind. Tax Ct. 2010) (citation omitted).   See also IND. CODE § 6-1.1-1-15 (2007) (amended 2008) (stating what constitutes "real property" for purposes of property tax assessment).

Accordingly, when valuing a property under the income approach, the fee simple interest in property must be valued based on an estimate of market rent, not contract rent. See  Grant Cty. Assessor v. Kerasotes Showplace Theatres, LLC, 955 N.E.2d 876, 881 (Ind. Tax Ct. 2011) (explaining that "'[a]ny potential value increment in excess of a fee simple estate is attributable to the particular lease contract . . . [and] constitute[s] contract

7

[rights] rather than real property rights'" (citation omitted)). Market rent is defined as the "most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement[.]" APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 447 (14th ed. 2013). Comparable rental data used to estimate market rent must therefore represent freely negotiated, arm's length transactions. See id. at 466.

**ANALYSIS**

On appeal, Southlake presents seven issues for the Court to decide. The Court consolidates and restates those issues as whether the Indiana Board's final determination must be reversed because it 1) relied on market rent values that are contrary to law; and 2) is unsupported by substantial and reliable evidence.

**1. Contrary to Law**

A final determination of the Indiana Board is contrary to law if it violates a statute, constitutional provision, legal principle, or rule of substantive or procedural law. See Meijer, 119 N.E.3d at 641. Southlake contends that in relying on Kenney's market rent estimates, the Indiana Board violated the legal principles in this Court's jurisprudence that leases reflecting contract rents cannot be used to estimate market rent. (See Pet'r Br. at 17-31, Pet'r Reply Br. at 4-5 (citing Kerasotes, 955 N.E.2d at 881-82).)

In its Kerasotes opinion, the Court rejected the use of unadjusted sale-leaseback transactions to determine market rent. See Kerasotes, 955 N.E.2d at 882. Noting that sale-leaseback transactions often value more than just the real property, the Court found that "one should approach the rental data from such transactions with caution, taking care to ascertain whether the sales prices/contract rents reflect real property value alone or

8

whether they include the value of certain other economic interests." Id. (citation omitted). Thus, while Kerasotes does not specifically prohibit the use of sale-leaseback transactions when valuing property, it does require either the adjustment of the rent to remove any non-taxable property values that are included or the presentation of evidence to show that the rent reflects the market value of the real property alone. See id.; Shelby Cty. Assessor v. CVS Pharmacy, Inc. #6637-02, 994 N.E.2d 350, 354 (Ind. Tax Ct. 2013) (finding that contract rent based on a sale-leaseback transaction valued more than the real property where the lease was used to generate business capital from investors). See also THE APPRAISAL OF REAL ESTATE at 466 ("[s]ince sale-leasebacks are actually financing vehicles, they should not be used in estimating market rent"). This same requirement of caution and adjustment applies to the use of build-to-suit leases when valuing property. See Kerasotes, 955 N.E.2d at 881-82 (citing Walgreen Co. v. City of Madison, 752 N.W.2d 687, 701, 703 (Wis. 2008)).

In this case, the Indiana Board acknowledged that Kenney had not adjusted the rental data contained in the build-to-suit leases on which he relied. (See, e.g., Cert. Admin. R. at 3373-74 ¶¶ 132, 136.) Nonetheless, the Indiana Board found that the testimony of Kendall Lees, a Kohl's Real Estate Expense Manager, supported Kenney's decision not to adjust the market rent estimates because they were above market due to business strategy, not because they reflected non-property interests associated with raising capital or financing personal property. (See Cert. Admin. R. at 3340-41 ¶¶ 20-22, 3374 ¶ 135, 3376 ¶ 140.) The Indiana Board, however, ignored both the breadth and substance of his testimony:

> Q. Does the build-to-suit and reverse build-to-suit structure transaction, does that allow Kohl's to open more stores?

9

A.  It does. You know, certainly, we're not necessarily cash poor, but, you know, some of these -- these are really financing transactions for going into these stores, these build-to-suit and reverse build-to-suit. So since Kohl's is not -- its not putting out all those funds for these stores, it frees up our cash for a lot of other things, to build more stores, for advertising, to expand.  You know, we've gone through a very significant expansion through the late '90s and 2000s.  And it's something -- like I said, we're not cash poor, but do have significant borrowings, so it[] helps to minimize some of our borrowings.

Q.  So does Kohl's make a conscious decision when it enters into a reverse build-to-suit or a build-to-suit lease . . . to incur an obligation for a rate of rent that it knows is above the market rate?

A.  No.  We certainly don't want to incur a rate above market rent . . . but I know it does happen. . . . [W]e developed strategy for where we want our stores.  And sometimes, those locations -- when we go into a new market, those locations -- some may be at market.  Some landowners, developers may not be willing to develop property at the time that we want to go in there.  So we need to pay a premium to get in.  It's cost effective for us to do that, because we're spreading it out over the entire market.  We can spread out our advertising costs.  And its something that we need to do to create a presence in the market in the right places.  There may be a location three miles away from an existing store that we can get for a market rent, but it's not where we want to be.  10 miles away might be another location that fits in better with our other stores, so we're willing to pay whatever the rent is there as long as it's something we can still -- we can make a reasonable profit on from our operations side.

*****

Q.  When Kohl's is negotiating a build-to-suit or reverse build-to-suit transaction, are they negotiating for a market rate of rent, or are they negotiating a financing transaction?

A.  We're negotiating for that financing transaction.

(Cert. Admin. R. at 1707-09; 1733-34.)

Lees's testimony confirms that Kohl's build-to-suit rents are often above market because they actually reflect non-property interests.  (See Cert. Admin. R. at 3340-41 ¶¶ 21-22, 3376 ¶ 140.)  Accordingly, the build-to-suit leases that both Kenney and the

Indiana Board relied upon should have been adjusted to be probative evidence of market rent under Kerasotes. There is no evidence in the administrative record that this occurred.

Moreover, the Indiana Board's explained that it properly relied on Kenney's market rent estimates because Coers also used unadjusted build-to-suit rents in her analysis. (See Cert. Admin. R. at 3373-74 ¶¶ 132-33, 136.) This explanation, however, is unsound. The evidence in the administrative record demonstrates that Coers treated the build-to-suit leases in her analysis in accordance with Kerasotes. Indeed, while Coers included unadjusted build-to-suit leases in her market extraction analysis, she explained that she ultimately did not consider them because they were old leases and she did not have a "great way" to adjust them to market levels. (See Cert. Admin. R. at 1458-59, 1490-91, 1667-69.) Coers further explained that she would not consider build-to-suit rental data in her analysis unless she could confirm that the leases were motivated by market terms, that the potential above-market rent could be isolated, or how the increment of tenant quality could affect the sales price. (See Cert. Admin. R. at 2599-2601.)

Coers also acknowledged that she considered market surveys that may have included build-to-suit lease data in her percentage of gross sales analysis and in the development of her capitalization rates. (See Cert. Admin. R. at 432, 1459-61; see also Pet'r Br. at 46-47 (explaining that Coers considered retail sales of properties with build-to-suit leases, not the rents for those properties).) Nonetheless, she repeatedly explained that she took care to either avoid reliance on or otherwise account for build-to-suit data influences. (See, e.g., Cert. Admin. R. at 1458-61 (stating that while she presented two Kohl's leases in her market rent comparable properties, she considered them to be far less relevant because they were build-to-suit), 432 (stating that in developing her

capitalization rates, "[l]eased fee sales of newer single-tenant, net lease investment properties like leased Kohl's were given less consideration because they typically involve above-market lease terms, and market participants price these properties based on the investment quality of the tenant"), 1462-63 (explaining that her percentage of gross sales analysis was not intended to value the business or even the specific user of the property in any way), 1471 (explaining that with a capitalization rate, it is nearly impossible to avoid using sales of leased properties where tenant quality and credit strength could factor into risk premiums paid when the property sells).) This evidence shows that Coers exercised caution – as required by Kerasotes – whenever build-to-suit rental data was included in her analyses, and the record is devoid of relevant evidence that shows otherwise. (See also Pet'r Br. at 42-47.) Accordingly, the Indiana Board's finding that Coers relied on build-to-suit leases that did not reflect market rent is unsupported by the record evidence.

In determining the subject property's market value-in-use, Kenney, and ultimately the Indiana Board, relied heavily on build-to-suit rental data that was neither adjusted nor explained as reflecting market rent as required by Kerasotes. Consequently, the Indiana Board's market rent conclusions are contrary to law.

### 2. Unsupported by Substantial and Reliable Evidence

A final determination is unsupported by substantial and reliable evidence if a reasonable person reviewing the entire record could not find enough relevant evidence to support it. See CVS Corp. (#6698-02) v. Monroe Cty. Assessor, 83 N.E.3d 1281, 1285 (Ind. Tax Ct. 2017). Southlake claims that the Indiana Board's adjustment of Coers's percentage of gross sales market rent estimates is unsupported by substantial and reliable evidence. (See Pet'r Br. at 34-39, Pet'r Reply Br. at 17-18.)

12

One method Coers used to develop her market rents was a percentage of gross sales analysis that evaluated potential sales of various types of retailers (i.e., discount department stores, junior department stores, junior discount department stores, and discount mixed apparel) and is published in national market surveys and other trade reports. (See Cert. Admin. R. at 411-16, 1461-65, 1674-80, 3349-50 ¶¶ 50, 52.) Coers also considered Kohl's national and Indiana sales data as a proxy for discount department stores sales. (See Cert. Admin. R. at 413, 1463.) Although Coers believed that the subject property was best categorized as a discount department store, she used the median sales from both the discount department store and the junior discount department store categories to develop a range of annual sales per square foot – with junior discount department stores representing the lower end of the range. (See Cert. Admin. R. at 414, 1676.) Coers then applied a range of rent, expressed as a percentage of sales from 1.5% to 3.0% as reported in "Dollars & Cents," to the median sales per square foot for each retail category to determine a market rent. (See Cert. Admin. R. at 415-16, 1462-1465, 1674-80 (explaining that expressing rent as a percentage of gross sales is like "equat[ing] 30 percent of your income going towards your house payment").)

In its final determination, the Indiana Board found Coers's analysis flawed because it could not duplicate her calculations, inferring that she "evidently" based it on gross rent clauses in the leases instead of rent as a percentage of gross sales. (See Cert. Admin. R. at 3376 ¶ 141 (stating that "[o]ftentimes, as with the lease on the Southlake Outlot, gross percentage rent is in addition to fixed rent[; t]he median clause percentage is not helpful without knowing the fixed median base rate").) The Indiana Board "corrected" Coers's alleged error by dividing the median rent per square foot by the median sales per

13

square foot to arrive at a new "range of medians of gross percentage sales as a measure of rent" of 2.03% to 4.22%, not the 1.5% to 3% range used by Coers. (See Cert. Admin. R. at 3376 ¶ 141.)

The Indiana Board also determined that the subject property's sales were more likely at the high end of Coers's discount department store sales per square foot rate range, and the percentage rental rate was best reflected by the junior discount department store category, not the discount department store category, due to its "prime location." (See Cert. Admin. R. at 3377 ¶ 142.) Based on those findings, the Indiana Board "reconstruct[ed]" Coers's gross percentage of sales analysis, multiplying its newly derived percentage rent for junior discount department stores by its newly concluded sales per square foot rate for discount department stores. (See Cert. Admin. R. at 3377 ¶¶ 142-43.) The Indiana Board's corrected calculations produced square foot rental rates ranging from $9.54 to $10.25 for the years at issue, which it found were "remarkably supportive of the market rents proposed by Kenney." (See Cert. Admin. R. at 3376-77 ¶¶ 141, 143.)

Southlake asserts that the Indiana Board's alteration of Coers's percentage of gross sales market rent estimation was made out of whole cloth – a new analysis and appraisal technique that is unsupported by record evidence. (See Pet'r Br. at 34-39, 48-50.) Southlake states that the Indiana Board's new analysis is tantamount to a rebuttal to Coers's evidence, which is the purview of an advocate and therefore outside of the scope of the Indiana Board's authority. (See Pet'r Br. at 48-50 (citing Hometowne Assocs. v. Maley, 839 N.E.2d 269, 280 (Ind. Tax Ct. 2005) (explaining that the Assessor carries the burden to rebut the taxpayer's prima facie case, not the Indiana Board)).)

14

The Indiana Board provided little basis for its conclusion that Coers's percentage of gross sales analysis was erroneous, and it seemed to bolster its conclusion by providing its own independent analysis to correct Coers's alleged error. (See Cert. Admin. R. at 3376 ¶ 141 n.2 (explaining that Coers's analysis was substantially flawed because it "infer[red] that the survey data references reported percentage rent clauses" when it could not duplicate her arithmetic).) Moreover, the Indiana Board cited no evidence or authority to support its methodology or show that it actually corrected the alleged error in Coers's analysis. (See Cert. Admin. R. at 3377 ¶¶ 142-43.) (See also Pet'r Br. at 38-39 (arguing that the Indiana Board provided no reason to mix and match the survey data, but doing so was the only way to get to a value that would support Kenney's market rents).) Accordingly, no reasonable person reviewing the administrative record would find enough relevant evidence to support the Indiana Board's reconstruction of Coers's percentage of gross sales analysis or its resulting conclusions; as a result, it is unsupported by substantial and reliable evidence. See Amax Inc v. State Bd. of Tax Comm'rs, 552 N.E.2d 850, 852 (Ind. Tax Ct. 1990) (stating that "'[s]ubstantial evidence is more than a scintilla[; i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (citation omitted)).

## CONCLUSION

The Tax Court reverses the Indiana Board's final determination in this matter because its reliance on Kenney's market rent estimates is contrary to law and its repudiation of Coers' percentage of gross sales analysis is unsupported by substantial

15

and reliable evidence.[3]  Accordingly, the Court remands the matter to the Indiana Board with instructions to assign the subject property a market value-in-use under the income approach that:  1) calculates the property's NOI each year at issue by replacing Kenney's market rents with the market rents derived by Coers through her reconciliation of her market extraction and gross percentage of sales estimations;[4] and 2) applies Coers's capitalization rates for 2010, 2011, and 2012, but Kenney's capitalization rates for 2007, 2008, 2009, 2013, and 2014.  (See Cert. Admin. R. at 3368 ¶ 116, 3380 ¶ 153.)

---

[3] Southlake asks the Court to determine several other issues including whether the Indiana Board erroneously ignored evidence and violated Southlake's due process rights, and whether the Assessor waived the ability to present certain arguments.  (See Pet'r Br. at 49-50, Pet'r Reply Br. at 5-6, Oral Arg. Tr. at 43-45.)  The Court will not address these issues because the matter is resolved on other grounds.

[4] The Indiana Board found Coers's third method of calculating market rent was not probative and the Court will not reweigh that evidentiary determination.  (See Cert. Admin. R. at 3371-72 ¶ 128, 3377 ¶ 144.)