ATTORNEYS FOR PETITIONER:
**JEFFREY T. BENNETT**
**BRADLEY D. HASLER**
BINGHAM GREENEBAUM DOLL LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**DAVID A. SUESS**
**STEPHEN H. PAUL**
**BENJAMIN A. BLAIR**
FAEGRE BAKER & DANIELS LLP
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

FILED

May 24 2018, 4:09 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

|  |  |
|---|---|
| SWITZERLAND COUNTY ASSESSOR, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Cause No. 49T10-1705-TA-00009 |
| ) | |
| BELTERRA RESORT INDIANA, LLC, ) | |
| ) | |
| Respondent. ) | |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**May 24, 2018**

WENTWORTH, J.

During the course of an administrative appeal, both Belterra Resort Indiana, LLC and the Switzerland County Assessor presented appraisals valuing Belterra's casino property for purposes of the 2009 through 2014 assessment years. On March 30, 2017, the Indiana Board of Tax Review issued a final determination that reviewed those appraisals and, ultimately, formulated its own value conclusion. Belterra and the Assessor have each separately appealed the Indiana Board's final determination, which the Court now affirms in part and reverses in part.

**RELEVANT FACTS AND PROCEDURAL HISTORY[1]**

Belterra owns and operates the Belterra Casino Resort in Florence, Indiana. For purposes of this appeal, the Resort consists of a Riverboat,[2] a Hotel,[3] a Golf Course,[4] and a total of 250.22 acres of land. (See generally Cert. Admin. R. at 1811-23.) The vast majority of the Resort's total gross revenue is generated by gaming. (See generally Cert. Admin. R. at 1950-53.)

During the years at issue, the Assessor's original assessment valued the Resort as follows:

| | |
|---|---|
| 2009: | $109,276,900 |
| 2010: | $108,775,300 |
| 2011: | $108,226,700 |
| 2012: | $ 92,505,200 |
| 2013: | $ 95,843,400 |
| 2014: | $ 93,170,100 |

---

[1] Portions of the administrative record in this case have been designated as confidential; consequently, this opinion will only provide the information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

[2] Built in 2000, the Miss Belterra is a self-propelled gaming vessel moored in the Ohio River; it contains approximately 40,000 square feet of gaming space and has a total carrying capacity of 3,132 (passengers and crew). (Cert. Admin. R. at 565.)

[3] The 605,798 square foot Hotel has 608 rooms and suites, multiple restaurants and lounges, a fitness center, spa/salon, retail outlets, concert hall, meeting and ballroom space, an outdoor pool, a parking garage and a surface parking lot. (Cert. Admin. R. at 1679, 1706-08.) The parking garage can accommodate 1,224 parked vehicles while the surface lot can accommodate 1,304. (Cert. Admin. R. at 1679.)

[4] The 18-hole, 206 acre Golf Course, designed by Tom Fazio, includes a driving range, pro shop, café and related improvements. (See Cert. Admin. R. at 556, 562, 628, 630-31, 1811, 1827.)

(See Cert. Admin. R. at 12 ¶ 10, 1827, 4186-87, 4194-95, 4199-4200, 4205-06, 4211-12, 4217-18.) Believing those values to be too high, Belterra initiated appeals with the Switzerland County Property Tax Assessment Board of Appeals (PTABOA). (See Cert. Admin. R. at 4189, 4197, 4202, 4208, 4214, 4220.) On June 24, 2015, Belterra transitioned its appeals to the Indiana Board.[5] (See, e.g., Cert. Admin. R. at 4183.)

In May of 2016, the Indiana Board conducted a consolidated hearing on all of Belterra's appeals. For purposes of the hearing, Belterra and the Assessor agreed to litigate only the Resort's 2009 and 2014 assessments, stipulating that the 2010 through 2013 assessments could then be determined with a trending formula based on the finally-determined 2009 and 2014 assessed values. (See Cert. Admin. R. at 4231-32.) Consequently, both Belterra and the Assessor's evidentiary presentations consisted of appraisals valuing the Resort for the 2009 and 2014 tax years alone. (See, e.g., Cert. Admin. R. at 10-12.)

### The Indiana Board Hearing:  Belterra's Evidentiary Presentation

Belterra presented appraisals by Robert Herman and David Lennhoff. Herman, a member of the Appraisal Institute (MAI), valued the Riverboat and Golf Course while Lennhoff, also an MAI, valued the Hotel. (See Cert. Admin. R. at 520, 979, 1659, 2337-39, 2783-84.) Both Herman and Lennhoff certified that their appraisals conformed to the Uniform Standards of Professional Appraisal Practice

---

[5] Indiana Code § 6-1.1-15-1 allowed Belterra to pursue its appeals with the Indiana Board without first receiving a final determination from the PTABOA. See IND. CODE § 6-1.1-15-1(o)(1) (2009) (indicating that when a property tax assessment board of appeals fails to conduct a hearing on an appeal within 180 days of its filing, the appeal may proceed directly to the Indiana Board).

(USPAP). (Cert. Admin. R. at 525-26, 984-85, 1660.) The appraisals indicated a total Resort value of $44,402,000 for 2009 and $48,675,000 for 2014. (See Cert. Admin. R. at 28 ¶ 69 n. 20, 357 ¶ 12, 525-26, 984-85, 1660, 2636-41.)

### 1.    Herman's Riverboat Valuations

There are three generally accepted appraisal techniques for valuing real property.[6] In valuing the Riverboat, Herman's appraisals employed two of them: the sales comparison approach and the cost approach. (See, e.g., Cert. Admin. R. at 527, 986.) Under the sales comparison approach, Herman estimated the Riverboat's market value-in-use to be $4,500,000 in 2009 and $3,500,000 in 2014 based on the price it would have garnered on the open market. (See Cert. Admin. R. at 574-602, 1033-86.) Under the cost approach, Herman estimated the Riverboat's market value-in-use as $8,600,000 for 2009 and $3,700,000 for 2014. (See Cert. Admin. R. at 604-16, 1088-1100.) Herman testified that he considered the third technique, the income approach, to be inappropriate to value the Riverboat because the Riverboat had no "discrete rental [income] stream" and it did not

---

[6] The three generally accepted appraisal techniques are: the sales comparison approach, the cost approach, and the income approach. 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 3; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2. The sales comparison approach "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." Manual at 3; 2011 Manual at 2. The cost approach "estimates the value of [any] land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." Manual at 3; 2011 Manual at 2. The income approach, which "is used for income producing properties that are typically rented[, ] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." Manual at 3; 2011 Manual at 2.

constitute a substantial portion of the Resort's total going concern value.  (See, e.g., Cert. Admin. R. at 527, 986, 2370-74.)

Herman reconciled his two values for each year into one final value conclusion:  $4,327,000 for 2009 and $3,500,000 for 2014.  (See, e.g., Cert. Admin. R. at 617-18, 1100-02.)  More specifically, he chose the lowest value of the two approaches indicated for each year (i.e., the $4,500,000 for 2009 and the $3,500,000 for 2014), and then trended the 2009 value back to its valuation date of January 1, 2008.  (See Cert. Admin. R. at 618, 1102.)  See also generally IND. CODE § 6-1.1-4-39.5(b) (2009); IND. CODE § 4-33-2-17 (2009) (together explaining that the assessed value of a riverboat was the lowest valuation determined under the cost, sales comparison, and income approaches); 50 IND. ADMIN. CODE 21-3-3(b) (2006) (indicating that prior to 2010, a property's March 1 assessment was to reflect a property's market value-in-use on January 1 of the preceding year) (repealed 2010).

### 2.      Herman's Golf Course Valuations

To value the Golf Course for 2009, Herman's appraisal used the cost approach and arrived at a value of $2,500,000.  (See, e.g., Cert. Admin. R. at 533, 535, 2519-30.)  For 2014, however, Herman's appraisal used the income approach and arrived at a value of $3,000,000.  (See, e.g., Cert. Admin. R. at 985, 992, 1604-07, 2530-45, 2636-41.)  Herman testified during the Indiana Board hearing that Indiana's Assessment Manual and Guidelines required him to value the Golf Course in 2009 using the cost schedules it provided, but for 2014, he used the income approach to value the Golf Course as mandated by the newly enacted Indiana Code § 6-1.1-4-42.  (See, e.g., Cert. Admin. R. at 2518-19, 2531-33.)

5

### 3. Lennhoff's Hotel Valuation

Lennhoff's appraisal used the income approach to value the Hotel. (See, e.g., Cert. Admin. R. at 1733-34 (explaining why he believed the sales comparison and cost approaches were not applicable to valuing the Hotel).) Under this approach, Lennhoff valued the Hotel at $37,575,000 for 2009 and $42,175,000 for 2014.[7] (See Cert. Admin. R. at 1731, 1769.)

Lennhoff explained that in completing his income approach, he treated the Hotel as if it were a "stand-alone," full-service hotel owned and operated independently of the casino operation. (See Cert. Admin. R. at 1720-21 (stating that this premise was necessary to extract any value that solely benefitted the casino operation because Belterra operated the Hotel as a marketing tool for the casino and, thus, as a "loss-leader").) Moreover, he relied on market income and expense data published in national investor surveys for full-service hotels as opposed to the Hotel's actual operating data, given the Hotel's prevalent practice of "comping" rooms in order to generate gaming business. (See, e.g., Cert. Admin. R. at 1739-49 (indicating that paying guests represented only a small percentage of the Hotel's total annual occupancy), 2885-86 (implying that had he used the Hotel's actual operating data, he would have produced a negative value), 2910 (stating that he put very little weight on the Hotel's actual income and expense figures).) Lennhoff noted that several other hotels that operated near casinos, but were owned independently from the casinos, generally performed about the same as full-service hotels. (See, e.g., Cert. Admin. R. at 2860-61, 2895-97, 2908-25.) Lennhoff acknowledged,

---

[7] These figures included value attributable to the parking garage, the surface parking lot, and approximately 29 acres of land. (See Cert. Admin. R. at 1679, 1765-67, 1769, 1811.)

however, that as a "stand-alone" hotel, the Hotel was "super-adequate" (i.e., over-improved) in relation to other full-service hotels. (Cert. Admin. R. at 1708, 1720-21.)

**The Indiana Board Hearing:  The Assessor's Evidentiary Presentation**

The Assessor offered her own evidence, presenting the USPAP-certified appraisals of Michael Cahill, MAI, that estimated the market value-in-use of the Resort's real property as $134,300,000 for the 2009 tax year and $127,000,000 for 2014 tax year.[8]  (See Cert. Admin. R. at 1840-41, 1846-47, 2062-63, 2068-69.) These values were notably higher than the 2009 and 2014 assessed values she initially assigned to the property.

Cahill's appraisals first used the income approach to determine that the going concern value of the entire Resort was $220,000,000 in 2009 and $190,000,000 in 2014. (See Cert. Admin. R. at 1843-45, 2065-67.) (See also e.g., Cert. Admin. R. at 1934-37, 1942, 1949 (explaining in part why he did not believe either the cost approach or the sales comparison approach were applicable to valuing casino properties), 3203-04, 3207-09 (explaining his view that appraising casino properties based on their going concern values was the most accurate method to reflect the relationship between tangible and intangible assets and that market participants rely upon this measure of value when deciding whether to invest).)  More specifically, Cahill used a discounted cash flow ("DCF") analysis to calculate the present value of

---

[8] The Assessor also presented a written review of the Herman and Lennhoff appraisals as prepared by another MAI, Mark Lukens (the "Appraisal Review").  (See Cert. Admin. R. at 2276-91.)  Ultimately, the Indiana Board found that the Appraisal Review carried no weight because Lukens co-signed Cahill's appraisal and was, therefore, inherently biased against the Herman and Lennhoff appraisals.  (See Cert. Admin. R. at 60-61 ¶ 178.)  Because the Assessor has not challenged this finding by the Indiana Board, the Appraisal Review warrants no further discussion.

the Resort's earnings before interest, taxes, depreciation, and amortization ("EBITDA")[9] over a 10-year holding period, to which he then added the present value of proceeds received from a hypothetical sale of the Resort in year 11. (See, e.g., Cert. Admin. R. at 1949, 1961, 1967, 2177, 2189, 2196.)  For his 2009 valuation of the Resort, Cahill projected that EBITDA would grow by 19.6% between 2009 and 2012, and then 3% in each of the remaining seven years, for a total of 46.6% over the 10-year projection period.  (See Cert. Admin. R. at 1961, 1963, 1967, 3766-67.) For his 2014 valuation, Cahill projected the Resort's EBITDA would grow by 17.8% between 2014 and 2017, and then 3% in each of the remaining seven years, for a total of 44.7% over the 10-year projection period.  (See Cert. Admin. R. at 2189, 2191, 2196, 3767-68.)

From the going concern values, Cahill deducted the value he attributed to each of the Resort's non-realty components (i.e., the personal property, the gaming license, and the business enterprise) to arrive at the market value-in-use of the Resort's real property of $134,300,000 for 2009 and $127,000,000 for 2014.  (See, e.g., Cert. Admin. R. at 1843-45, 1970-78, 2065-68, 2201-11.)  Specifically, Cahill valued the Resort's personal property relying on the personal property tax returns Belterra previously filed with the Assessor.  (See Cert. Admin. R. at 1970-71, 2201-02.)  To determine the value of the gaming license, Cahill applied a multiplier to the Resort's EBITDA to account for its monopolistic value in a restricted market casino state.  (See Cert. Admin. R. at 104 ¶ 296, 1971-75, 2202-07.)  To determine the

---

[9] In the hospitality industry, EBITDA is the measure of cash flow typically considered by investors. (Cert. Admin. R. at 3236-37.)  Hotel EBITDA is gross operating profit minus fixed charges, management fees, and reserves; casino EBITDA is net operating income prior to any deductions for management fees and reserves.  (Cert. Admin. R. at 3237.)

8

value of the business enterprise, Cahill used a "Dark Casino Theory," which computed two income capitalization approaches: one for the property as if closed, the other for the property upon reopening, attributing the difference between the two, plus any "pre-opening costs," as the business enterprise value. (See Cert. Admin. R. at 1975-77, 2207-10.)

Cahill then allocated approximately 55% of these real property values to the Riverboat and the other 45% to the Hotel and Golf Course. (See Cert. Admin. R. at 1979-81, 2212-13.) He based his allocations on the relative percentages of developmental income derived from, and costs incurred by, the Riverboat, Hotel, and Golf Course. (See Cert. Admin. R. at 1979-81, 2212-13.)

**The Indiana Board's Final Determination**

By the end of the administrative hearing, Belterra and the Assessor had presented the Indiana Board with two competing market value-in-use estimates derived from entirely different methodologies. Those positions were, again, as follows:

|  | Belterra | Assessor |
|---|---|---|
| 2009 Riverboat: | $ 4,327,000 | $76,200,000 |
| 2009 Golf Course: | $ 2,500,000 | |
| 2009 Hotel: | $37,575,000 | |
| 2009 Hotel & Golf Course Combined: | _____ | $58,100,000 |
| 2009 Total: | **$44,402,000** | **$134,300,000** |

9

|  | Belterra | Assessor |
|---|---|---|
| 2014 Riverboat: | $ 3,500,000 | $68,100,000 |
| 2014 Golf Course: | $ 3,000,000 | |
| 2014 Hotel: | $42,175,000 | |
| 2014 Hotel & Golf Course Combined: | _____ | $58,400,000 |
| 2014 Total: | **$48,675,000** | **$127,000,000**[10] |

(See Cert. Admin. R. at 28 ¶ 69 n. 20, 357 ¶ 12, 525-26, 984-85, 1660, 1981-82, 2212-13, 2636-41.)

After evaluating each party's estimate and weighing the evidence provided to it, the Indiana Board issued a final determination valuing the Resort as follows:

|  | 2009 | 2014 |
|---|---|---|
| Riverboat: | $ 4,327,000 | $ 3,500,000 |
| Golf Course: | | $ 3,000,000 |
| Hotel: | $94,173,000 | $92,000,000 |
| Total: | **$98,500,000** | **$98,500,000** |

(See Cert. Admin. R. at 8, 114-16 ¶¶ 313-20.) Before it arrived at this result, the Indiana Board expressed how difficult it perceived its task to be:

> The [Indiana] Board must determine the value of the real estate of a casino: a type of property that is not rented, not sold separate from business assets except [when] in distress, and where there is sparse law on how it should be valued. There is no rental income, there are no comparable sales, and the market never considers the value of the real property separate from the business assets. Highly credentialed experts disagree on the most basic points of approach, method, and technique, and reach values nearly $100M apart. . . . In the task at hand, the [Indiana]

---

[10] This number is slightly different from the actual sum of its two components, presumably due to rounding. (See Cert. Admin. R. at 2212-13.)

10

Board finds a certain affinity with the Roman haruspex as we must divine [the Resort's market value-in-use].

(Cert. Admin. R. at 78 ¶ 232.)

### 1.    The Indiana Board's Analysis of Belterra's Evidence

The Indiana Board rejected Herman's cost approaches valuing the Riverboat for 2009 and 2014 and the Golf Course for 2009.[11]  Despite disagreements with some minor points, however, the Indiana Board found that Herman's sales approach was probative in demonstrating the market value-in-use of the Riverboat for both 2009 and 2014.  (See Cert. Admin. R. at 79-82 ¶¶ 235-44.)  The Indiana Board also found Herman's income approach valuing the Golf Course for 2014 probative.  (See Cert. Admin. R. at 84 ¶ 249.)

With respect to the Hotel, the Indiana Board determined that Lennhoff's valuation was not probative for two main reasons.  First, the Indiana Board explained that in relying upon the income and expense data for full-service hotels, Lennhoff failed to value the Hotel for what it really was:  a luxury destination resort hotel with amenities otherwise not available at full-service hotels.  (See Cert. Admin. R. at 84 ¶ 250, 86-87 ¶¶ 254-57.)  Second, the Indiana Board stated that "[e]ven if [] Lennhoff's use of full-service hotel data was sound, his projections of income and expenses were not credible."  (Cert. Admin. R. at 89 ¶ 262.)  For instance, the Indiana Board

---

[11]  The Indiana Board explained that in solely using the cost schedules provided in Indiana's Assessment Guidelines, Herman failed to provide other market-based, objective evidence, as required by the Manual, to rebut the presumption of accuracy afforded to the initial assessment computation, which itself was calculated using the Guidelines' cost schedules. (See Cert. Admin. R. at 66-68 ¶¶ 196-200, 83 ¶¶ 245-46, 84 ¶ 248.)  The Indiana Board recognized that its rejection of Herman's 2009 and 2004 cost approach valuations for the Riverboat had little effect, however, because Herman based his final Riverboat values on his sales comparison approach alone.  (Cert. Admin. R. at 83 ¶ 247.)

11

found that Lennhoff systematically underestimated the income attributable to the Hotel by using average daily room rates and occupancy rates much lower than those rates published in the investor surveys for full-service hotels. (Cert. Admin. R. at 89-91 ¶¶ 262-63.) In addition, the Indiana Board found that Lennhoff overestimated the Hotel's expenses in relation to the data published for full-service hotels. (See, e.g., Cert. Admin. R. at 92 ¶ 266.)

### 2. The Indiana Board's Analysis of the Assessor's Evidence

Turning to the Assessor's evidence, the Indiana Board found Cahill's going concern income methodology a valid means of valuing the Resort. (Cert. Admin. R. at 74-78 ¶¶ 221, 226-31, 97 ¶ 281.) The Indiana Board adopted Cahill's conclusions regarding the Resort's going concern value, finding the assumptions underlying his income and expense projections (and upon which his EBITDA calculations were based) "reasonable." (See generally Cert. Admin. R. at 98-101 ¶¶ 283-87.) The Indiana Board also adopted the values Cahill attributed to the resort's personal property and gaming license that he extracted from the Resort's going concern value. (Cert. Admin. R. at 104-05 ¶¶ 296-99.)

The Indiana Board, however, did not accept the values Cahill attributed to the Resort's business enterprise because he calculated them using a "Dark Casino Theory." Indeed, the Indiana Board explained that Cahill's "Dark Casino Theory" was not a generally accepted appraisal technique, and the values he computed thereunder were not credible unless tested against values computed using a well-recognized appraisal theory such as the Rushmore approach. (Cert. Admin. R. at 105-06 ¶¶ 300-01.)

The Indiana Board explained the Rushmore approach, which is commonly applied in the valuation of New Jersey casino properties, as

> hypothesizing that [if] the property owner employs a professional management agent to take over the day-to-day operations of the business enterprise, the property owner is in the position of a passive investor in real property who makes no profit from the business operation of the property. The business value – deducted in the form of a hypothetical market rate management fee – represents the value of the business enterprise.

(Cert. Admin. R. at 105-06 ¶¶ 300-01 (quoting Marina Dist. Dev. Co. v. City of Atlantic City, 27 N.J. Tax 469, 528 (2013)).) (See also Cert. Admin. R. at 73-74 ¶¶ 218-21.) The Indiana Board performed the Rushmore approach itself and determined that Cahill had understated the Resort's business enterprise value by approximately $38 million in 2009 and $30 million in 2014. (See Cert. Admin. R. at 106-12 ¶¶ 302-05, 307.)

### 3. The Indiana Board's Formulation of Value for the Resort

After "sift[ing] through a collection of imperfect approaches[ and] methodologies," the Indiana Board found that it still had "sufficient probative evidence to establish the value of the [Resort] in conformity with the law." (Cert. Admin. R. at 9 ¶ 3.) (See also Cert. Admin. R. at 114 ¶ 314.) Consequently, the Indiana Board synthesized the probative evidence into one final value conclusion for 2009 and another for 2014.

First, the Indiana Board adjusted Cahill's real property valuation by deducting the increased business enterprise value it calculated using the Rushmore approach. (See, e.g., Cert. Admin. R. at 108-12 ¶¶ 305-08.) As adjusted, the Indiana Board's total real property value for the Resort was $98,500,000 for both 2009 and 2014, in

13

contrast to the $134,300,000 for 2009 and the $127,000,000 for 2014 originally calculated by Cahill. (Compare, e.g., Cert. Admin. R. at 110 ¶ 306, 112 ¶ 308 with 1846, 2068.)

Next, the Indiana Board allocated $4,327,000 of the $98,500,000 to the Riverboat for 2009, $3,500,000 to the Riverboat for 2014, and $3,000,000 to the Golf Course for 2014, consistent with Herman's probative valuations of those components. (See Cert. Admin. R. at 114-15 ¶¶ 316-17.) The remainder values – $94,173,000 for 2009 and $92,000,000 for 2014 – were then allocated to the rest of the Resort. (See Cert. Admin. R. at 114-15 ¶¶ 316-17.) The Indiana Board explained that it believed these allocations were "reasonable and proportionate" given that the Riverboat comprised only about 6% of the Resort's total square footage. (See Cert. Admin. R. at 114 ¶ 315.)

Both the Assessor and Belterra subsequently initiated original tax appeals. After consolidating the two appeals, the Court heard the parties' oral arguments on January 9, 2018. Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the parties in this case must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without

14

observance of the procedure required by law; or unsupported by substantial or reliable evidence.  See IND. CODE § 33-26-6-6(e)(1)-(5) (2018).

Here, the parties' appeals ask the Court to reverse the Indiana Board's final determination because it is not supported by substantial evidence.  The substantial evidence standard authorizes this Court to set aside the Indiana Board's findings of fact only when the administrative record, viewed as a whole, indicates that the Indiana Board's decision lacks a reasonably sound basis of evidentiary support. See Bailey Seed Farms, Inc. v. State Bd. of Tax Comm'rs, 542 N.E.2d 1389, 1391 (Ind. Tax Ct. 1989) (citing City of Evansville v. S. Indiana Gas & Elec. Co., 339 N.E.2d 562, 572 (Ind. Ct. App. 1975)).  See also, e.g., Mabasa v. Gonzales, 455 F.3d 740, 744 (7th Cir. 2006) (explaining that when a court reviews an agency decision under the substantial evidence standard, it must "assess whether the . . . determination was 'supported by reasonable, substantial, and probative evidence on the [administrative] record considered as a whole'" (citation omitted)); Starke Cnty. Assessor v. Porter-Starke Servs., Inc., 88 N.E.3d 814, 820 (Ind. Tax Ct. 2017) (defining substantial evidence as "more than a scintilla"; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).  Because the substantial evidence standard is a highly deferential one, the Court will uphold the Indiana Board's final determination unless, based upon the evidence presented, a reasonable person would be compelled to reach a different result.  See, e.g., McClain v. Review Bd. of Indiana Dep't of Workforce Dev., 693 N.E.2d 1314, 1318 n. 3 (Ind. 1998).

15

**LAW**

In Indiana, real property is assessed on the basis of its market value-in-use which is its value "for its current use, as reflected by the utility received by the owner or a similar user[.]" 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 2. See also IND. CODE § 6-1.1-31-6(c) (2009). Accord 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2. Because Indiana's property tax system taxes the value of real property – and not intangible business value, investment value, or the value of contractual rights – this Court has explained that "market value-in-use, as determined by objectively verifiable market data, is the value of a property for its use, not the value of its use." Stinson v. Trimas Fasteners, 923 N.E.2d 496, 501 (Ind. Tax Ct. 2010) (citation omitted).

For purposes of taxation, riverboats are classified as real property.[12] IND. CODE § 6-1.1-1-15 (2009). By statute, the market value-in-use assessment of a riverboat is to be

> the lowest valuation determined by applying each of the following appraisal approaches:
>
> (1) Cost approach that includes an estimated reproduction or replacement cost of buildings and land improvements as of the date of valuation together with

---

[12] In 2009, a riverboat was defined as 1) either a self-propelled excursion boat located in a county contiguous to Lake Michigan or the Ohio River or a vessel located in a historic hotel district and 2) upon which lawful gambling is authorized. See IND. CODE § 4-33-2-17 (2009); IND. CODE § 4-33-1-1(1), (2) (2009). By 2015, that definition had been amended several times to include casinos located in historic hotel districts, permanently moored craft, and real property adjacent to riverboat docking sites. See I.C. § 4-33-2-17 (amended 2010, 2011, 2015); IND. CODE § 4-33-6-24 (2015).

estimates of the losses in value that have taken place due to wear and tear, design and plan, or neighborhood influences using base prices determined under 50 IAC 2.3 and associated guidelines published by the [Department of Local Government Finance].

(2) Sales comparison approach, using data for generally comparable property, excluding values attributable to licenses, fees, or personal property, as determined under 50 IAC 4.2.

(3) Income capitalization approach, using an applicable capitalization method and appropriate capitalization rates that are developed and used in computations that lead to an indication of value commensurate with the risks for the subject property use.

I.C. § 6-1.1-4-39.5(b).

**ANALYSIS**

Both the Assessor and Belterra presented a myriad of arguments claiming, for one reason or another, that the Indiana Board's final determination is erroneous and must be reversed. (See, e.g., Pet'r Br. ("Assessor Br.") at 2-3, 30-48; Pet'r Reply Br. ("Assessor Reply Br.") at 4; Resp't Initial Br. ("Belterra Br.") at 4-5, 12-46; Oral Arg. Tr. at 4-6, 9-10, 59-61, 66-67, 78-79, 81, 99-100.) Upon reviewing those arguments, however, the Court consolidates and restates them as: whether the Indiana Board erred when it 1) rejected Lennhoff's Hotel valuation and 2) adopted Cahill's going concern valuation.

**1. Did the Indiana Board Err in Rejecting Lennhoff's Hotel Valuation?**

On appeal, Belterra maintains that the Indiana Board's decision to give no weight to Lennhoff's Hotel valuation must be reversed because it is not supported by substantial and reliable evidence. Belterra explains that

17

[t]he [Indiana] Board fundamentally misunderstood the testimony and approach taken by . . . Lennhoff. As a result, in both its findings of fact and conclusions of law, the [Indiana] Board substantially mischaracterized key aspects of Lennhoff's appraisal and testimony – and then relied on th[o]se mischaracterizations to reject the . . . appraisal. In short, errors the [Indiana] Board characterized as central to Lennhoff's appraisal were not errors Lennhoff committed; they were the [Indiana] Board's misconception of what he did. As a result, the [Indiana] Board failed to meaningfully consider Lennhoff's actual approach, rendering its conclusions unsupported by the record evidence.

(Belterra Br. at 38.) More specifically, Belterra contends that the Indiana Board's misunderstanding is revealed by its conclusion that Lennhoff valued the Hotel as a full-service hotel rather than a resort hotel, a conclusion unsupported by the evidence in the administrative record. (Belterra Br. at 39.) For instance, Belterra explains that because Lennhoff's income analysis valued the revenue streams from each of the Hotel's amenities (restaurants, salon, retail outlets, etc.), he necessarily valued the Hotel as a resort hotel and not as a full-service hotel. (See Belterra Br. at 39-40.) Belterra also notes that while the investor surveys Lennhoff relied on included data on full-service hotels, they "certainly [were] not limited to 'full[-]service hotels[.]'" (Belterra Br. at 40.) Finally, Belterra asserts that the evidence shows that Lennhoff performed a qualitative analysis of all of the data contained in the investor surveys to forecast an average daily rate for the Hotel that reflected its location and amenity offerings. (See Belterra Br. at 40-41.)

The Indiana Board's final determination explains, however, that it rejected Lennhoff's valuation not because it used income and expense data for full-service hotels per se, but because it used this data without making any adjustments to account for the inherent differences between the Hotel and full-service hotel

18

properties.[13] (See Cert. Admin. R. at 87 ¶ 256 (explaining that "non-luxury, cookie-cutter franchised hotels" have "irreconcilably different physical attributes, amenities, and business models" than the Hotel), 89 ¶ 261 (noting that the Indiana Board was "sympathetic" with the difficulty in finding "reliable [income and expense] data because comparable casino-hotels all have the same issue with comping[,]" but that Lennhoff needed to "either find a reliable way to adjust the data to account for the differences between resorts and full-service hotels, or choose a different approach" altogether).) The evidence shows that Lennhoff recognized that there were inherent differences between the Hotel and full-service hotels. (See, e.g., Cert. Admin. R. at 1720 (where Lennhoff defines a full-service hotel as one that "may operate an on-site restaurant/bar, a coffee kiosk, and a small retail store" (emphasis added)), 1727 (where Lennhoff states that the Hotel provides design and amenities superior to any full-service hotel).) Nonetheless, the administrative record does not show that Lennhoff accounted for those differences when he valued the Hotel. (See, e.g., Cert. Admin. R. at 1729-30 (demonstrating Lennhoff relied on income and expense figures from a Kentucky Ramada Inn and a Kansas Hampton Inn – despite the fact that the figures for those hotels were even lower than other full-service hotels in the region – simply because they were "destination" hotels), 1739-47 (indicating that Lennhoff used average daily room rates for the Hotel that were lower than the published benchmarks for full-service hotels in the region and that his expense

---

[13] The Indiana Board's explanation that adjustments must be made to account for differences between properties comports with expert authority on how to relate "comparable" properties when valuing property. See, e.g., Appraisal Institute, THE APPRAISAL OF REAL ESTATE 377-78, 465 (14th ed. 2013) (indicating that when performing both sales comparison and income approaches to value, an appraiser must make adjustments to the "units of comparison" between the subject property and the allegedly similar properties).

projections for the Hotel were merely calculated as a percentage of his room revenue).) Moreover, Lennhoff himself testified that he valued the Hotel as a market-based, full-service hotel. (Cert. Admin. R. at 2911.)

Belterra has not persuaded the Court that the Indiana Board misunderstood Lennhoff's evidence or position. Moreover, a reasonable person would find evidence that Lenhoff did not adjust for the differences between the Hotel and the data upon which he based his valuation. Accordingly, the Indiana Board's decision to give Lennhoff's valuation no weight is supported by the evidence, and the Court will not reverse its determination on this issue.

**2. Did the Indiana Board Err in Adopting Cahill's Going Concern Valuation?**

In adopting Cahill's going concern valuation of the Resort, the Indiana Board necessarily adopted his EBITDA growth projections for the Resort. See supra, page 8. On appeal, Belterra claims those EBITDA growth projections are "directly at odds with all objectively verifiable record evidence indicating *declining* market conditions and *declining* EBITDA at the [Resort]." (Belterra Br. at 3.) Indeed, Belterra points to evidence in the administrative record showing that between 2006 and 2014 the economic climate surrounding Belterra's hotel and casino business – as well as that of its competitors – was bleak. For instance, the "Great Recession" was in full swing, unemployment was high, and fewer people were gambling. (See, e.g., Cert. Admin. R. at 1889-91, 1922, 2146, 3726, 3771-72, 3789-91.) As a result, gaming revenues generally were down and were even lower for Belterra. (See, e.g., Cert. Admin. R. at 1799, 1805, 1920-22, 1926, 2146, 3787-91.) (See also Cert. Admin. R. at 1896, 2116, 2153, 3822-23 (explaining that despite the economic climate, Ohio

20

had legalized gaming and two casinos opened in its southwestern quadrant, which had a greater negative effect on Belterra than the economic downturn alone had on most of its competitor casinos in the northern half of Indiana).) Concomitant with declines in gaming revenue, Belterra's EBITDA underlined decreased during the relevant time period. (See, e.g., Cert. Admin. R. at 1801, 1807, 1951-54, 2178-82.)

The Assessor asserts, however, that this evidence, and hence Belterra's claim, is "completely undone" by certain other evidence she presented to the Indiana Board. (See generally Assessor Reply Br. at 10-11, 15-17 (citations omitted).) Specifically, she explains that her evidence shows that:

> 1) for purposes of its budget, Belterra projected an EBITDA increase between 2008 and 2009 while Cahill projected a decrease, and that between 2013 and 2014, Cahill projected a greater EBITDA decrease than Belterra budgeted (compare Cert. Admin. R. at 1953-54 with 1967, 2181-82 with 2196);
>
> 2) retail sales and population were expected to grow in the Louisville and Cincinnati markets between 2009 and 2015 (see Cert. Admin. R. at 1886, 1892, 2107, 2112, 3310 (implying that if the population is growing, the number of people gambling is growing), 3317-18 (implying that if retail sales are increasing, people have more disposable income to spend on activities such as gambling)); and
>
> 3) the Resort had "upside potential" to increase its market share. (See Cert. Admin. R. at 1901, 1917-18, 2121, 2142, 3337-38, 3341-42, 3344, 3358-60 (indicating the Resort's market penetration rates in 2008 and 2013).)

After considering this evidence, however, the Court is not persuaded that a reasonable person would find it supports Cahill's EBITDA growth projections for the following reasons.

First, with respect to her evidence regarding the parties' EBITDA projections, the Assessor argues that because Belterra budgeted greater EBITDA growth

21

between 2008 and 2009 than Cahill and Cahill projected greater EBITDA decline between 2013 and 2014 than Belterra, Belterra obviously believed that the economic market was not as "turbulent" as it claimed. (See Assessor's Reply Br. at 10-11.) The Court notes, however, that Belterra's projections were developed internally for budgeting purposes. (See, e.g., Cert. Admin. R. at 1953-54, 2181-82.) Accordingly, it was imperative that the Assessor provide an explanation or citation to authority showing how such projections consider the same or similar elements to EBITDA growth projections developed by a third-party for purposes of estimating the appraisal value of real property. Without that, a reasonable person would find the Assessor's claim that Belterra's budget evidence supports Cahill's EBITDA growth projections, and thus the Indiana Board's determination on the issue, merely speculative.

Second, even though the Assessor's evidence indicates positive retail sales and population growth in the Louisville and Cincinnati markets between 2008 and 2015, it indicates much lower growth than Cahill used, i.e., the average annual compounded rate of growth between 2008 and 2015 was less than 2% for retail sales and less than 1% for population growth. (See Cert. Admin. R. at 1886, 1892, 2107, 2112.) These small growth increases do not reasonably support Cahill's total EBITDA growth projections of 46.6% over the course of his first 10-year DCF projection period and 44.7% over his second 10-year DCF projection period.

Third, the Assessor claims that her evidence regarding the Resort's market penetration rate demonstrates that potential investors would have considered the Resort's upside potential for increasing its market share, and thus its potential

22

increased revenues. (See Assessor Reply Br. at 16.) Nonetheless, the Indiana Board determined that the measure Cahill used to calculate his market penetration rate – wins per unit per day ("WPUPD") – was unreliable. (See Cert. Admin. R. at 98 ¶ 283 (explaining that "because taking machines and tables in or out of service does not change overall demand . . .[g]ross gaming revenue is a more reliable gauge").) To that end, the Assessor's own evidence shows that the Resort's gross gaming revenue in 2009 was only a small percentage of the total gaming revenue dollars spent in the southern Indiana market, and the Resort's gross gaming revenue in 2014 was even less than what it was in 2009. (See Cert. Admin. R. at 1901, 2121.) As a result, the Assessor's evidence does not support Cahill's increased market penetration rates, but actually demonstrates that the Resort lost market penetration between 2009 and 2014.

Finally, the reasonableness of Cahill's EBITDA growth projections is called into question by his own testimony. For instance, Cahill explained during the Indiana Board hearing that when conducting a DCF analysis, growth projections must be calculated with an eye towards the specific property within its specific market. (See, e.g., Cert. Admin. R. at 3681-82.) He admitted, however, that the 3% annual growth rate he applied to the last seven years of each of his two 10-year projection periods was not based on property or market specifics, but rather was based on an arbitrary inflationary rate his appraisal firm frequently applied in practice, unrelated to the specific property or its market. (See Cert. Admin. R. at 3430, 3815-17 (stating that his firm chose to use the 3% rate because because "[m]ost investors use 3[%]").) In addition, while Cahill's growth projections for his two 10-year projection periods were

23

very similar, he admitted that Belterra was affected by very different market conditions during each 10-year period. (See, e.g., Cert. Admin. R. at 3817, 3821-22.) Cahill testified that between 2009 and 2010, the transactional markets for both hotels and gaming properties were "horrible and getting worse[,]" as sales transactions were falling apart or properties were selling for a fraction of their pre-Great Recession sales prices. (Cert. Admin. R. at 3726-27, 3772.) In fact, he further testified that things were so bad on both the 2009 and 2014 assessment dates that the "gaming industry's equity and debt financing markets [] economically prohibit[ed] the development/replication of an asset such as the [Resort.]" (Cert. Admin. R. at 1969, 2200, 3843.)

The EBITDA projections that Cahill used to compute the Resort's going concern value are not supported by substantial and reliable evidence. As a result, the Court reverses the Indiana Board's determination adopting Cahill's going concern valuation of the Resort.

### CONCLUSION

The Indiana Board's finding that Lennhoff's Hotel appraisal was not probative is AFFIRMED. The Indiana Board's finding that Cahill's appraisal valuing the Resort was probative, however, is REVERSED. Given that 1) the Resort's assessment increased by more than 5% between 2008 and 2009 and 2) neither party proved an assessment for the Resort in its entirety, the property's 2008 assessed value of $102,295,300 is reinstated (see IND. CODE § 6-1.1-15-17.2(a), (b), (e) (2014); Cert. Admin. R. at 1827, 4217), subject to the following modifications:

1) the Assessor shall remove the portion of value attributable to the Riverboat and replace it with the value of $4,327,000 for the 2009

24

assessment and $3,500,000 for 2014 assessment, consistent with Herman's appraisal of the Riverboat for those years;

2) the Assessor shall remove the portion of value attributable to the Golf Course and replace it with $3,000,000 for the 2014 assessment, consistent with Herman's appraisal value of the Golf Course for that year;

3) the portion of value attributable to the Golf Course in 2008 shall remain as originally assessed for 2009; and

4) the portion of value attributable to the Hotel in 2008 shall remain intact for both 2009 and 2014.[14]

---

[14] On a final note, the Court acknowledges the Assessor's claim that Belterra's proposed valuation of the Resort failed to account for all the land and improvements actually delineated on the property record card. (See, e.g., Pet'r Br. Resp. Initial Br. of Resp't ("Assessor Resp. Br.") at 61-62.) Given the Court's instructions for valuing the Resort on remand, however, it need not address that claim, as the Assessor's 2008 assessed value would have accounted for that property.