ATTORNEYS FOR PETITIONER:
**BRIAN CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN


**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

ATTORNEYS FOR RESPONDENT:
**BRENT A. AUBERRY**
**BENJAMIN A. BLAIR**
 **DAVID A. SUESS**
FAEGRE BAKER DANIELS LLP
Indianapolis, IN


 **MICHAEL B. SHAPIRO**
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
Detroit, MI

_____

# IN THE
# INDIANA TAX COURT

FILED

Feb 08 2019, 3:28 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

_____

|  |  |  |
|---|---|---|
| CLARK COUNTY ASSESSOR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 18T-TA-00003 |
| | ) | |
| MEIJER STORES LP, | ) | |
| | ) | |
| Respondent. | ) | |

_____

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**February 8, 2019**

WENTWORTH, J.

The Clark County Assessor has challenged the Indiana Board of Tax Review's final determination that lowered the assessed value of the Meijer store in Jeffersonville, Indiana for each of the 2008 through 2016 assessment years. Upon review, the Court affirms the Indiana Board's final determination.

**FACTS AND PROCEDURAL HISTORY**

Meijer Stores LP owns and operates a 180,000 square foot retail store and a 2,432 square foot gas station/convenience store, both situated on one 32.42 acre parcel of land in Jeffersonville, Indiana (the subject property). Meijer constructed the stores in 1998/1999.

During the years at issue, the Assessor assigned the following assessed values to the subject property:

| 2008: | $12,160,100 |
|---|---|
| 2009: | $12,167,000 |
| 2010: | $11,732,600 |
| 2011: | $11,732,600 |
| 2012: | $10,017,000 |
| 2013: | $ 9,904,400 |
| 2014: | $10,021,000 |
| 2015: | $ 9,966,000 |
| 2016: | $ 9,969,100 |

(See Cert. Admin. R. at 1-2, 13-14, 26-27, 40-41, 52-53, 72-73, 86-87, 105-06, 142-43.) Believing those values to be too high, Meijer filed appeals first with the Clark County Property Tax Assessment Board of Appeals and then with the Indiana Board.

In November of 2017, the Indiana Board conducted one administrative hearing on all of Meijer's appeals. For purposes of the hearing, however, Meijer and the Assessor agreed to litigate only the subject property's 2012 assessment,

2

stipulating that the other years' assessments could be determined by applying an agreed-upon trending formula to the finally-determined 2012 assessed value. (See Cert. Admin. R. at 128-29.)

**The Indiana Board Hearing:  Meijer's Evidence**

During the Indiana Board hearing, Meijer presented, among other things, an Appraisal Report, completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP), that valued the subject property as of March 1, 2012.  Meijer also presented the testimony of Laurence Allen, a member of the Appraisal Institute (MAI), who prepared the Appraisal Report ("Meijer Appraisal").

To value the subject property, Allen first employed the sales comparison approach.[1]  Under this approach, he examined data relating to the fee simple sales of numerous other big-box stores that had occurred throughout the Midwest between 2006 and 2013.  (See, e.g., Cert. Admin. R. at 389, 431-40, 1633-44.)  After adjusting the sales prices of those properties to account for differences in the age and condition of their improvements, their location, as well as the condition of the market at the time of sale, Allen used the data to determine a probable sales price for the subject property of $7,570,000.  (See Cert. Admin. R. at 450-98, 1645-54, 1658.)

---

[1] The sales comparison approach, one of the three generally accepted appraisal techniques for valuing real property, "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market."  2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.) (repealed 2010)) at 3; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2.

3

Allen also employed the income approach to value the subject property.[2] Under this approach, Allen first estimated the subject property's net operating income using market-based rental rates, occupancy rates, and operating expense levels. (See, e.g., Cert. Admin. R at 1659-66.) Allen explained that he used the market-based rental rates from existing big-box stores rather than rates from big-box properties with "built-to-suit" leases in place, because the former were more representative of both occupant expectations and improvement age. (See, e.g., Cert. Admin. R. at 564-69.) Allen then considered investor surveys and comparable property sales and performed a band-of-investment analysis to determine the capitalization rate to apply against his net operating income estimate. (See, e.g., Cert. Admin. R. at 580-84, 1666-68.) Under his income approach, Allen estimated the 2012 value of the subject property to be $7,610,000. (See Cert. Admin. R. at 1668-69.)

Ultimately, Allen reconciled his sales comparison and income approach values into a final value conclusion for 2012 of $7,600,000. (See Cert. Admin. R. at 1676-77.) In concluding this final value, Allen explained that he did not consider the third generally accepted appraisal technique, the cost approach,[3] to be a reliable method of valuing the subject property for two reasons. First, he stated that buyers and sellers of big-box stores typically do not rely on the cost approach to determine

---

[2] The income approach, another generally accepted appraisal technique for valuing real property, applies to "income producing properties that are typically rented[ and] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." Manual at 3; 2011 Manual at 2.

[3] The cost approach "estimates the value of [any] land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value." Manual at 3; 2011 Manual at 2.

4

value. (See, e.g., Cert. Admin. R. at 430-31, 1631.) Second, he stated that the use of the cost approach to value the subject property is redundant because like most big-box retail properties, it suffered from significant obsolescence that "is difficult, if not impossible, to estimate without extracting from the other approaches to value." (See Cert. Admin. R. at 590-601, 1631.) (See also Cert. Admin. R. at 415-17, 421-24, 430-31, 592-94, 597-98 (where Allen explains that big-box properties suffer from obsolescence immediately upon construction because they are built for their users' exact specifications; subsequent users will never pay "cost" for these properties because they must incur extensive expenditures to adapt the properties to their own use).)

### The Indiana Board Hearing: The Assessor's Evidence

During the Indiana Board hearing, the Assessor offered her own USPAP-certified appraisal that valued Meijer's property for the 2012 tax year ("Assessor's Appraisal") at $11,200,000. (See, e.g., Cert. Admin. R. at 1728-32.) In addition, she presented the testimony of David Hall, MAI, the primary author of the Assessor's Appraisal.

In his testimony, Hall first stated that he disagreed with Allen regarding the propriety of using the cost approach. Indeed, Hall reasoned that the cost approach was the best approach to value the subject property because it was depreciating at a rate consistent with its age and suffered from no obsolescence whatsoever. (See, e.g., Cert. Admin. R. at 892-94, 919-20, 1849 (stating there could be no functional obsolescence because "the subject has been continuously occupied since completion of construction, and [] the buildings are consistent with market norms in

5

construction quality, size, utility, and design"), 1850 (stating there could be no economic obsolescence because local and national economic trends "were positively impacting [the] demand" for properties like Meijer's).)  Under his cost approach, Hall estimated that the subject property's 2012 market value-in-use was $11,300,000.  (See Cert. Admin. R. at 1845-51.)

Hall also performed an income approach to value the subject property.  In calculating net operating income, Hall, unlike Allen, used rental, occupancy, and expense rates derived from built-to-suit leases (i.e., leases to first-generation users).  (See Cert. Admin. R. at 971-74, 1877-80, 1882-85.)  Like Allen, however, Hall considered investor surveys and comparable property sales and performed a band-of-investment analysis to determine the capitalization rate to apply against his net operating income estimate.  (See, e.g., Cert. Admin. R. at 1888-91.)  Ultimately, under his income approach, Hall estimated the 2012 value of the subject property was $11,200,000.  (Cert. Admin. R. at 1891.)

Finally, Hall valued the subject property using two separate sales comparison approaches.  In his first sales comparison valuation, Hall used the leased-fee sales of occupied big-box properties as his comparables.  (See Cert. Admin. R. at 1751-52, 1853 (asserting that the leased-fee properties best reflected Meijer's utility because they were 100% occupied as retail space at the time of their sale).)  Hall maintained that The Appraisal of Real Estate, 14th edition, instructed that because the leased-fee properties were all leased at market rates, no adjustments were necessary to account for the difference in the type of property rights conveyed.  (See, e.g., Cert. Admin. R. at 922-24, 928-37, 1746, 1853-55, 1857, 1876.)  Based

6

on this analysis, Hall determined a probable sales price for the subject property of $11,200,000. (Cert. Admin. R. at 946, 1863.)

For his second sales comparison valuation, Hall relied on fee simple sales of vacant big-box properties as his comparables. (Cert. Admin. R. at 1751-52, 1853 (explaining that these comparables transferred fee simple property rights and were not new construction, just like the subject property).) Hall adjusted the sales prices of these comparables by 45% to account for the fact that they, unlike the subject property, were vacant. (See, e.g., Cert. Admin. R. at 787-91, 927, 958-69, 1748-51 (explaining that "[v]acancy adversely impacts a property's utility" because it might indicate atypical motivations to sell, such as excess supply or duress, that adversely influence sale price).) From this analysis, Hall determined a probable sales price for the subject property was $10,900,000. (See Cert. Admin. R. at 2251-52.)

Hall reconciled all four values into one final value conclusion of $11,200,000. (Cert. Admin. R. at 1898.) His reconciliation gave his second sales comparison approach value the least amount of weight. (See Cert. Admin. R. at 1899.)

**The Indiana Board's Final Determination**

The Indiana Board issued its final determination on December 1, 2017. In it, the Indiana Board explained that because both Meijer and the Assessor presented USPAP-compliant appraisals from qualified experts, it needed to weigh the competing appraisals and determine which one was more persuasive. (See Cert. Admin. R. at 2423 ¶ 78.) Ultimately, the Indiana Board determined that Meijer's Appraisal was more persuasive than the Assessor's Appraisal.

7

With respect to the parties' income approaches, the Indiana Board's analysis was rather brief, stating that while each party's income approach suffered from some infirmities that detracted from its overall reliability, each one was still somewhat probative. (See Cert. Admin. R. at 2427-29 ¶¶ 92-97, 2431 ¶¶ 102-04.) In reviewing the parties' sales comparison approaches, the Indiana Board stated that the Meijer Appraisal presented a sufficient quantity and quality of data to arrive at the subject property's March 1, 2012, value of its fee simple interest. (See, e.g., Cert. Admin. R. at 2398 ¶ 1, 2403 ¶ 19, 2425 ¶ 85, 2426 ¶ 87, 2427 ¶ 91.) In contrast, the Indiana Board found neither of the Assessor's sales comparison approaches probative at all:

> In [its first] sales analysis, we find that [the Assessor's Appraisal] actually measured the leased[-]fee value of the subject property. In [its second] sales analysis, we find [the] vacancy adjustment entirely unsupported. These two errors render [the Assessor's] sales-comparison approaches entirely unreliable[.]

(Cert. Admin. R. at 2431-32 ¶ 105.) In fact, the Indiana Board held that these two errors were so significant and fundamental that they effectively undermined any probative value overall that the Assessor's Appraisal may have had otherwise. (See Cert. Admin. R. at 2398 ¶ 1, 2435 ¶ 114.)

Finally, in addressing the use of the cost approach to value the subject property, the Indiana Board explained that it was not necessary to apply the cost approach because deriving an obsolescence adjustment from the sales comparison and income approaches alone was appropriate. (Cert. Admin. R. at 2425 ¶ 85, 2430 ¶ 100.) Thus, the Indiana Board found that the fact that Allen did not perform a cost approach to value the subject property was not improper. (See Cert. Admin. R. at 2425 ¶ 85, 2430 ¶ 100.) The Indiana Board reasoned that due to the "large

8

discrepancy" between the Meijer Appraisal's values computed under its sales comparison and income approaches and the Assessor Appraisal's cost approach, the subject property suffered from obsolescence that the Assessor's Appraisal failed to account for. (Cert. Admin. R. at 2435 ¶ 114.) Accordingly, the Indiana Board deemed the Assessor's cost approach unreliable. (Cert. Admin. R. at 2435 ¶ 114.)

Finding that the Meijer Appraisal was more persuasive than the Assessor's Appraisal, the Indiana Board reduced the subject property's 2012 assessment consistent with the Meijer Appraisal's reconciled value of $7,600,000. (Cert. Admin. R. at 2435-36 ¶¶ 114-15.) The Assessor subsequently initiated this original tax appeal on January 12, 2018, and the Court conducted oral argument on the matter on July 19, 2018. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2019).

9

**ANALYSIS**

The Assessor claims the Indiana Board's final determination must be reversed because it is contrary to law, not supported by substantial evidence, and constitutes an abuse of discretion. More specifically, she asserts that the final determination is contrary to law because in accepting Meijer's valuation over hers, the Indiana Board ignored the generally accepted appraisal practices that 1) required Allen to adjust his sales comparables to account for expenditures incurred after those properties were purchased, and 2) permitted Hall to use leased-fee sales as comparable properties. (Pet'r Br. at 7-15; Oral Arg. Tr. at 4-6, 25-27.) The Assessor also argues that the final determination must be reversed because there is no evidence to support the Indiana Board's conclusion that 1) the leased-fee sales used in her first sales comparison valuation were not credible and reliable, and 2) Meijer's property suffered from obsolescence. (Pet'r Br. at 15-20; Oral Arg. Tr. at 29, 35-37.) Finally, the Assessor argues that the Indiana Board's final determination constitutes an abuse of discretion because it "failed to apply a consistent burden of proof[.]" (Pet'r Br. at 20-21; Oral Arg. Tr. at 39-41.)

**Contrary to Law**

1) Post-Purchase Adjustments to Sales Comparables

On appeal, the Assessor explains that she presented evidence demonstrating that several properties used as comparables in the Meijer Appraisal's sales comparison approach incurred large post-purchase expenditures. (See Pet'r Br. at 4-5 (citing Cert. Admin. R. at 705, 1294, 1301, 1310, 1326); Pet'r Reply Br. at 2.) The Assessor contends that pursuant to The Appraisal of Real Estate, 14th edition,

Allen was <u>required</u> to adjust the sales prices of those comparable properties to account for those expenditures. (Pet'r Br. at 10.) Because he did not, the Assessor claims that the final determination that ultimately adopted the Meijer Appraisal's final value conclusion is contrary to law and must be reversed. (<u>See</u> Pet'r Br. at 7-11; Oral Arg. Tr. at 4-19.) The Court finds the Assessor's argument unpersuasive for the following reasons.

First, the two pages of <u>The Appraisal of Real Estate</u> that the Assessor cites do not <u>mandate</u> adjustments for post-purchase expenditures. (<u>Compare</u> Pet'r Br. at 10 <u>with</u> APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 412-13 (14th ed. 2013).) Rather, they (along with a few other pages) indicate that adjustments for <u>certain types</u> of post-purchase expenditures <u>may</u> be appropriate <u>but only after</u> the terms of the sale transaction have been verified through interviews with the transaction's participants. <u>See</u> THE APPRAISAL OF REAL ESTATE at 404-05, 412-14. (<u>See</u> <u>also</u> Oral Arg. Tr. at 18 (where the Assessor concedes that <u>The Appraisal of Real Estate</u> does not mandate the adjustments but then "clarifies" that an appraiser should, at a minimum, consider whether a post-purchase expense adjustment is appropriate).)

Notwithstanding, both the Assessor and Meijer have indicated that adjustments for post-purchase "re-imaging" costs are not necessary.[4] (<u>Compare</u> Pet'r Reply Br. at 3 <u>with</u> Cert. Admin. R. at 454-77, 592-93 <u>and</u> Resp't Resp. Br. at 11-12.) The evidence to which the Assessor cites indicates how much the owners of

---

[4] "Re-imaging" refers to the types of renovations a second-generation user would make to a property to align its layout and appearance with a specific business plan or model. (<u>See,</u> <u>e.g.</u>, Cert. Admin. R. at 415-17, 421-24, 592-94 (describing generally how a Meijer store is different from a K-Mart, Walmart, or Target store).)

11

the comparable properties incurred in post-purchase expenditures but does not show what the expenditures were for. (See Pet'r Br. at 4-5; Cert. Admin. R. at 705, 1294, 1301, 1310, 1326.) Nonetheless, Meijer's appraiser, Allen, testified that the costs presented by the Assessor were all attributable to re-imaging and that adjustments were therefore unnecessary.[5] (See, e.g., Cert. Admin. R. at 476-77.)

Second, and more importantly, a final determination of the Indiana Board is contrary to law only if it violates a statute, constitutional provision, legal principle, or rule of substantive or procedural law. Shelbyville MHPI, LLC v. Thurston, 978 N.E.2d 527, 529 (Ind. Tax Ct. 2012). The Appraisal of Real Estate is not a statute, constitutional provision, legal principle, or rule of substantive or procedural law; it is a textbook, used by the appraisal profession, to instruct its members on the "principles of appraisal and the sound application of recognized valuation methodology." THE APPRAISAL OF REAL ESTATE at ix. To the extent an appraiser relies on the guidance provided in The Appraisal of Real Estate to complete an appraisal assignment, the result, his appraisal, is still merely his opinion. See Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 502 (Ind. Tax Ct. 2010) (explaining that the appraisal of property is not a science). Consequently, the Assessor has not shown that the Indiana Board's final determination is contrary to law on this basis.

---

[5] The Assessor argued that her evidence of expenditures shifted the evidentiary burden to Meijer to demonstrate the purpose of those expenditures was something other than re-imaging. (See Pet'r Br. at 10-11.) The Assessor, however, bore the burden of demonstrating that Allen's testimony was wrong, and her claim that Allen "should have done more" regarding her evidence (see Pet'r Br. at 10 (arguing that more investigation by Allen "could have significantly affected his value conclusions")) does not suffice.

12

2) Use of Leased-Fee Sales in Sales Comparison Approach

As previously indicated, the Indiana Board rejected the Assessor's sales comparison approach analysis that used leased-fee sales of occupied big-box properties as comparables because it failed to measure the fee simple value. The Assessor contends, however, that the Indiana Board's rejection of that analysis was contrary to law because it ignored the generally accepted appraisal practice noted in The Appraisal of Real Estate that permits the use of leased-fee sales as comparable properties in the sales comparison approach. (See Pet'r Br. at 11-15; Oral Arg. Tr. at 20-27.) The Assessor's claim fails because, as the Court just explained, The Appraisal of Real Estate is not law.

Furthermore, the Court notes that the Indiana Board rejected the Assessor's first sales comparison approach as unreliable because it was not supported by the evidence. (See Cert. Admin. R. at 2433 ¶ 108.) Indeed, the final determination acknowledged that the leased-fee sales may be used as comparables, but only if they are properly adjusted to put them on "a level playing field" with the subject property.[6] (See Cert. Admin. R. at 2426 ¶ 87.) Hall did not make any adjustments, however, to account for the differences in the type of property rights conveyed between the subject property and the leased-fee sales comparables; instead, he asserted that his leased-fee sales comparables did not require adjustment because they were all leased at market rates. (See Cert. Admin. R. at 922-24, 928-37, 1746, 1853-57, 1876.) The Indiana Board found that even if his assertion that market rate leases relieved the requirement to adjust were correct, Hall failed to prove that the

---

[6] The Indiana Board stated that when a sufficient number of fee simple sales exists for use as comparisons, however, "it is not necessary to resort to leased fee sales." (Cert. Admin. R. at 2426 ¶ 87.)

leased-fee properties were in fact leased at market rates. (See Cert. Admin. R. at 2432-33 ¶ 107 (stating that Hall's claim that the comparables were leased at market rents was based largely on "circular reasoning").) (See also Cert. Admin. R. at 2415-16 ¶ 56 (where, in relaying Hall's testimony, the Indiana Board indicates that Hall's sole support for asserting his comparables were leased at market rates "was the data and conclusions from his own income approach," which itself used the same leased-fee properties as comparables), 2432 ¶ 107.)

#### Not Supported by Substantial Evidence

Next, the Assessor argues on appeal that the final determination must be reversed because it is not supported by substantial evidence. Specifically, she maintains that there is no evidence to support the Indiana Board's conclusion that 1) the leased-fee sales comparables she used in her first sales comparison approach were not credible and reliable, and 2) Meijer's property suffered from obsolescence. (Pet'r Br. at 15-20; Oral Arg. Tr. at 29, 35-37.)

1) The Credibility and Reliability of the Assessor's Leased-Fee Sales

As previously discussed, the Indiana Board gave no weight to Hall's first sales comparison analysis because the Assessor did not prove that his leased-fee sales comparables were leased at market rents. The Assessor claims on appeal, however, that "the evidence, facts, and circumstances surrounding th[ose] sales . . . undoubtedly support the conclusion that the[y] . . . were leased[] at market rent" and therefore the first sales comparison approach "provided a reliable and credible opinion of value [that] should have been adopted by the [Indiana] Board." (Pet'r Br. at 11-12, 15.)

14

The Assessor's claim asks the Court to reweigh the evidence that was presented to the Indiana Board in her favor. The Court cannot reweigh the evidence absent a showing that the Indiana Board has abused its discretion. See Trimas Fasteners, 923 N.E.2d at 498-99. See also Hubler Realty Co. v. Hendricks Cty. Assessor, 938 N.E.2d 311, 315 n.5 (Ind. Tax Ct. 2010) (explaining that the Indiana Board abuses its discretion when it either misinterprets the law or when its final determination is clearly against the logic and effect of the facts and circumstances before it). To demonstrate an abuse of discretion, the Assessor first points out that in her first sales comparison approach, four of Hall's six comparable properties were leased at rates between $5.13 and $6.90 per square foot. (See Pet'r Br. at 14 (citing Cert. Admin. R. at 1862, 2415).) (See also Cert. Admin. R. at 1854-55.) She then maintains that there was "no logical path" for the Indiana Board to determine those rental rates were not at market levels because "[t]here's no evidence that . . . suggests these properties were leased at above market rents"; moreover, "all [the rates] fall within the range of [] rents [that were] provided by Allen [in the Meijer Appraisal.]" (Pet'r Br. at 14-15; Oral Arg. Tr. at 27-28, 31.) The Assessor's argument does not, however, rise to the level of demonstrating an abuse of discretion.

First of all, her argument is argumentum ad ignorantiam, meaning that she claims "a proposition is true simply on the basis that it has not been proved false[.]" PHILOSOPHY 103: INTRODUCTION TO LOGIC ARGUMENTUM AD IGNORANTIAM, https://philosophy.lander.edu/logic/ignorance.html (last visited Feb. 6, 2019). This "logical fallacy" is a type of argument used to shift the burden of proof improperly from the one who actually bears it. ARGUMENT FROM IGNORANCE,

https://en.wikipedia.org/wiki/Argument_from_ignorance.html (last visited Feb. 6, 2019).

Second, the final determination states that the only evidence Hall relied on to support his conclusion that the rental rates were at market levels was his own income approach analysis. (See, e.g., Cert. Admin. R. at 2415-16 ¶ 56 (citing Cert. Admin. R. at 931, 934), 2432 ¶ 107 (noting that Hall's reasoning was circular because he used the same comparables in both his income approach and his first sales comparison approach analysis).) If, however, the Assessor wanted the Indiana Board to follow a specific path to conclude that the leased-fee rental rates were at market levels (e.g., comparing her rental rates to with those used by Allen in the Meijer Appraisal), she needed to walk the Indiana Board down that path during the administrative process. Because the Assessor failed to do so, she cannot now rectify her misstep. See, e.g., Blesich v. Lake Cty. Assessor, 46 N.E.3d 14, 17 (Ind. Tax Ct. 2015); Long v. Wayne Twp. Assessor, 821 N.E.2d 466, 471 (Ind. Tax Ct. 2005), review denied; Davidson Indus. v. Indiana State Bd. of Tax Comm'rs, 744 N.E.2d 1067, 1071 (Ind. Tax Ct. 2001) (all indicating that this Court has repeatedly reminded litigants that they have a duty to walk the Indiana Board, and ultimately this Court, through every element of their analyses; they cannot assume that the evidence speaks for itself).

Based on its review of the evidence in the administrative record, the Court is not persuaded that the Indiana Board's determination that the Assessor failed to demonstrate that the rents used in her first sales comparison approach were at market levels was against the logic and effect of the facts and circumstances before

16

it. Accordingly, the Court will not reverse the Indiana Board's final determination on this basis.

2) Obsolescence

The Assessor also argues that there is no evidence in the administrative record to support the Indiana Board's conclusion that the subject property suffers from obsolescence. (Pet'r Br. at 15-17.) She asserts that simply because sales prices were much lower per square foot than the per square foot value under the cost approach does not prove obsolescence has occurred. (See Pet'r Br. at 16; Pet'r Reply Br. at 8.) As a result, she concludes that Meijer failed to both identify and quantify the amount of obsolescence it claimed was present in its property. (See Pet'r Br. at 15-18; Oral Arg. Tr. at 35-36.) See also Hometowne Assocs. v. Maley, 839 N.E.2d 269, 273-74 (Ind. Tax Ct. 2005) (explaining that a taxpayer must support its claim that obsolescence has diminished the value of its property with probative evidence that 1) identifies the causes of the alleged obsolescence and 2) quantifies the amount of obsolescence to be applied to its improvements).

Under the substantial evidence standard, this Court reviews the administrative record to determine whether, when viewed as a whole, it provides a reasonably sound basis of evidentiary support for the Indiana Board's decision. Switzerland Cty. Assessor v. Belterra Resort Indiana, LLC, 101 N.E.3d 895, 904 (Ind. Tax Ct. 2018), review denied. See also Starke Cty. Assessor v. Porter-Starke Servs., Inc., 88 N.E.3d 814, 820 (Ind. Tax Ct. 2017) (defining substantial evidence as "more than a scintilla"; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion). Because the substantial evidence

17

standard is a highly deferential one, the Court will uphold the Indiana Board's final determination unless, based upon the evidence presented, the Assessor can show that a reasonable person would be <u>compelled</u> to reach a different result. <u>See</u> <u>Belterra Resort</u>, 101 N.E.3d 904.

Allen testified at length about what he believed had a diminishing effect on the value of Meijer's property. Indeed, he explained numerous times that big-box properties generally, and the subject property specifically, suffer from obsolescence immediately upon construction because they are built for first-generation users to their exact specifications, and in turn, subsequent users will never pay "cost" for these properties because they must incur extensive expenditures to adapt the properties to their own use. (<u>See</u> Cert. Admin. R. at 415-17, 421-24, 430-31, 592-94, 597-98.) Allen's testimony adequately identifies the cause of the obsolescence and is consistent with a paradigm this Court has long accepted as valid. <u>See, e.g.</u>, <u>Meijer Stores Ltd. P'ship v. Smith</u>, 926 N.E.2d 1134, 1137-39 (Ind. Tax Ct. 2010) (indicating that a newly constructed Meijer store was adversely impacted by obsolescence).

Furthermore, Meijer's Appraisal quantifies the amount of obsolescence Allen claimed was the result of that cause. As this Court has previously explained, all three approaches to valuation quantify obsolescence, they just do it differently. Indeed, while the cost approach to valuation accounts for the obsolescence explicitly, the sales comparison and income approaches account for it implicitly. <u>Millennium Real Estate Inv., LLC v. Benton Cty. Assessor</u>, 979 N.E.2d 192, 197-98 (Ind. Tax Ct. 2012), <u>review denied</u>. Allen's conclusion is buttressed by the fact that,

18

as the final determination stated, there was a very large difference between the values computed under the Meijer Appraisal's sales comparison and income approaches and the Assessor Appraisal's cost approach. (Compare Cert. Admin. R. at 2435 ¶ 114 with Hometowne Assocs., 839 N.E.2d at 275 (explaining that "the difference [between a property's valuations under the income/sales comparison approaches and the cost approach is] attributable to the obsolescence present in the property").)

The Court holds that there is a reasonably sound basis of support in administrative record for the Indiana Board's conclusion that the subject property suffered from obsolescence. Accordingly, the Court will not reverse the Indiana Board's determination on this issue either.

## Abuse of Discretion

Finally, the Assessor contends that the Indiana Board's final determination constitutes an abuse of discretion because it failed to apply a consistent burden of proof. Specifically, she complains that "[p]articularly as to rebuttal evidence and the credibility of the data and witnesses, the [Indiana] Board's expectations and the burden of proof fluctuated without any apparent authority." (Pet'r Br. at 20.)

In essence, the Assessor's complaint is a restatement of the burden-shifting arguments already peppered throughout her appeal presentation. (See Pet'r Br. at 20-21 (claiming Meijer bore the burden of proof on the issue relating to adjustments to account for post-purchase expenditures as well as on the issue whether the rental rates for Hall's leased fee sales were not at market levels).) The Court has already

19

addressed and rejected these claims.  <u>See</u> <u>supra</u> note 5, pp. 15-16.  As a result, the Court will not reverse the Indiana Board's final determination on this basis.

## CONCLUSION

The Assessor has not demonstrated to the Court that the Indiana Board's final determination is contrary to law, unsupported by substantial evidence, or constitutes an abuse of discretion.  Accordingly, the Indiana Board's final determination in this matter is AFFIRMED.